H. J. GASTON, *et al.*

*v.*

S. E. WOLFE

(No. 10076)

Submitted April 19, 1949. Decided May 24, 1949.

792

*Wysong & Wysong*, for appellant.

*Hoover, Hoover & Bickell, Wm. T. O'Brien*, for appellees.

LOVINS, JUDGE:

H. J. Gaston and Lawson Gaston, hereinafter designated as the "Gastons", filed their bill of complaint in the Circuit Court of Webster County against S. E. Wolfe, hereinafter referred to as "Wolfe", for the purpose of compelling an accounting by Wolfe of the profits allegedly made in operating a store pursuant to a contract made between the parties hereto. The cause was referred to a commissioner in chancery, who reported that Wolfe was indebted to the Gastons, as of December 31, 1944, in the sum of $3,300.00. Wolfe's exceptions to said report were overruled; the report was confirmed; and a decretal judg-

ment in the amount of $3,300.00 was awarded the Gastons without prejudice to their rights to sue for such amounts as may have accrued under said contract after December 31, 1944. Wolfe prosecutes this appeal from that decree.

The controlling issues are: (1) Is Wolfe entitled to rescind the contract between the Gastons and himself bearing date May 27, 1940; and (2) is the commissioner's report supported by the evidence?

The Gastons and Wolfe had entered into a prior agreement in the year 1939, concerning the operation of a general store near Bergoo, Webster County, West Virginia, which resulted in other litigation.

On May 27, 1940, Wolfe, his wife, Oliver Williams and his wife, entered into a written contract with the Gastons which related to the operation of a store on land owned by Wolfe and Williams. The first part of the contract demised and leased a tract of land of approximately 1.8 acres situate near Bergoo to the Gastons, the terms of said lease being substantially as follows: The lease was for a term of ten years commencing February 11, 1939, at an annual rental of $5.00, with the provision that the Gastons may have an additional term of five years at a rental to be fixed by agreement or arbitration on the expiration of the term above mentioned. The Gastons were granted the right to occupy the building then erected on the land for the purpose of operating a store, and they were authorized to erect and install a garage, gasoline or oil station. No garage, gasoline or oil station was erected on the land. The lease provided that the Gastons would pay the taxes levied upon the building or buildings erected on the leased premises.

The second part of the contract provided that Wolfe should be employed as general manager of the store to be operated on the land under the name "The Economy Market", which will be hereinafter referred to as the "market". The Gastons agreed to "fully stock the store building now

erected on said premises * * *" with merchandise "in proper proportions and quantities, as the needs of the trade of the store may be shown to require, the minimum amount of said stock at wholesale, shall be from $1200.00 to $1500.00, itemized statements or invoices of all goods furnished to the said store, shall be given the said Wolfe upon shipment or as soon as possible thereafter." It was further provided that Wolfe, as general manager of the market, should be under the direction of the Gastons in the operation thereof; that inventories should be made quarterly; that Wolfe should sell the merchandise for cash, or its equivalent; that settlements between them would be made monthly, so far as possible, final settlements to be made quarterly after said inventories were made; and that Wolfe would not incur any debts or liabilities against the Gastons without their consent.

Wolfe's compensation was provided for as follows.: "* * * the parties of the second part [the Gastons] shall pay to the said Wolfe a guaranteed salary of $15.00 per week, regardless of the income of said store; and in addition thereto he shall be paid one-half of all net profits said store shall earn over and above $120.00 per month; and, in case the net profits of said store fall under $120.00 per month for sixty consecutive days, then the said parties of the second part may, upon notice dispense with the services of said Wolfe, but if said depreciation in income to a point below $120.00 per month shall be caused by strikes, shut downs of contiguous industries, or the act of God or the alien enemy, then the said Wolfe shall remain as manager notwithstanding the loss of trade to the extent aforesaid; and further, if the said notice to said Wolfe be given as herein provided, then the parties of the second part shall pay to him a bonus of $100.00 in cash, in addition to his profits and salary as herein above set forth; provided further that the said depreciation in sales below $120.00 shall not be at any time caused by the actions or failure to furnish stock by the parties of the second part; it being understood that this contract is one of personal service and not of partnership."

It was further provided that the contract of May 27, 1940, should constitute a settlement of "all suits and differences" between the Gastons and Wolfe, and that a suit then pending in the Circuit Court of Webster County should be dismissed.

After the execution of the above contract, Oliver William and his wife sold their interest in the tract of land to Wolfe, who is now the sole owner.

The Gastons and Wolfe operated the market under the above contract, commencing on or about its date. For a short time most of the merchandise sold by Wolfe was purchased from the Gaston Grocery Company, evidently a wholesale grocery which the Gastons owned, or in which they had an interest, but which was not connected with the business of the market.

In this suit, however, Wolfe asserts that the Gastons breached or abandoned the contract, and that they have no further interest in, or ownership of, the market. Wolfe relies upon the fact that the Gastons did not "stock" the market with merchandise of the value of $1200.00, in accordance with the contract. The testimony with respect to the time at which Wolfe contends he elected to consider the contract "rescinded" is uncertain, he having stated that it was in either 1942 or 1944. The Gastons assert that the market has always been operated under the terms of the contract, but admit that in March, 1944, Wolfe refused to permit one of the Gastons to examine certain accounts of the store, ordered him to leave the building, and notified the Gastons that he was operating the store for his sole benefit.

Wolfe procured the services of an auditor to audit the business of the market to December 31, 1944. From that audit it appears that Wolfe claims the Gastons are indebted to him in the sum of $2,288.43. The audit made for Wolfe only takes into consideration the business transacted at the market up to December 31, 1944, and, in calculating

the profit made by the market, only those goods purchased from the Gaston Grocery Company and sold by the market in the course of business are taken into consideration.

One of the Gastons, with the assistance of an auditor, made an audit of the business for the same period. The Gaston audit takes into consideration all of the goods bought and sold at the market from June 1, 1940, to December 31, 1944, and arrives at a balance due the Gastons from Wolfe of $7,879.52.

Two bank accounts were opened in the name of the market: one at the Webster Springs National Bank, subject to the check of either of the Gastons, all of which money was withdrawn and paid to the Gaston Grocery Company for merchandise furnished the market by that concern. Other moneys were deposited in the Bank of Pickens in Wolfe's name, most of which has been withdrawn. The documentary evidence is in conflict. Many of the exhibits filed with the testimony of the witnesses are not in the record.

It appears that the primary, if not the sole, cause of this litigation is the failure of the parties hereto to make monthly and quarterly settlements as provided in their contract. In making both audits heretofore referred to reliance is had upon somewhat fragmentary records consisting of invoices, checks, bank statements, Wolfe's books of accounts, and considerable conjecture. To set forth the many items of credits and debits claimed by the Gastons and Wolfe would unduly prolong this opinion. It suffices to say that the calculations and audits of the Gastons and Wolfe are not controlling in deciding the issues involved in this suit as we view them. The differences are based primarily upon Wolfe's claim that the contract has been abandoned or breached by the Gastons, and that he has the right to rescind said contract.

It is asserted that the trial court did not pass upon the question of rescission. It is true that the decree complained of does not expressly refuse to grant rescission; but the

action of the trial court in confirming the report of the commissioner, which showed an accounting to December 31, 1944, and the provision of the decree that it was entered without prejudice to the right of the Gastons to sue for such amounts as may accrue under the contract after December 31, 1944, indicate clearly that the trial court, by necessary implication, denied Wolfe's right to rescind the contract. See *Coal Co. v. Coal Co.*, 117 W. Va. 447, 186 S. E. 119.

Wolfe was employed as "general manager" of the market. The authority given him by the use of that term and the provisions of the contract authorize him to control and operate the market, subject to the limitations provided by the contract. *Coal Co. v. Coal & Coke Co.*, 83 W. Va. 205, 98 S. E. 148. Wolfe was the general agent of the Gastons, the terms "general manager" and "general agent" being almost synonymous. *Fruit Co. v. Brydon & Bro.*, 85 W. Va. 609, 614, 102 S. E. 231; *Producers Coal Co. v. Mifflin Coal Co.*, 82 W. Va. 311, 95 S. E. 948. As such agent Wolfe owed the duty of the "* * * utmost good faith, and will not be allowed to use his principal's property for his own advantage, or to derive secret profits or advantages to himself by reason of the relation of principal and agent existing between him and his principal." *Sutherland v. Guthrie*, 86 W. Va. 208, 103 S. E. 298. See *Newcomb et al. v. Brooks et al.*, 16 W. Va. 32. Nor will he be permitted to make "* * * a personal profit out of his fiduciary relations aside from the compensation allowed by law or by his contract * * *." *Laing v. Crichton*, 110 W. Va. 3, 6, 156 S. E. 746. Of course, the Gastons are liable to Wolfe for the amounts agreed upon as his compensation.

But disregarding for the moment the question of good faith due from Wolfe to the Gastons, is Wolfe entitled to rescission of the contract of May 27, 1940? Rescission is the converse of specific performance, and lies within the sound discretion of the trial court. *Holderby v. H. C. Taylor Co.*, 87 W. Va. 166, 172, 104 S. E. 550; *Hagen v. Taylor* (Va.), 65 S. E. 487.

Admittedly the market has been operated by Wolfe, notwithstanding the failure of the Gastons to furnish merchandise in accordance with the contract. It is also significant that in his answer Wolfe does not offer to restore the *status quo* existing before the execution of the contract, which failure so to offer, as a general rule, would prevent granting rescission or cancellation of the contract. *Matney v. Blakely*, 97 W. Va. 291, 124 S. E. 918. It is doubtful that the *status quo* could be restored. If it is impossible to restore the *status quo*, rescission will not be granted. *Holderby v. H. C. Taylor Co., supra.* Moreover, the contract has been partially executed, and if the contract should be rescinded on the insubstantial grounds advanced by Wolfe, it would result in a loss of the Gastons' proper share of the profits which have already accrued. *Holderby v. H. C. Taylor Co., supra.*

At one point in his testimony Wolfe says that the Gastons commenced to neglect furnishing merchandise in June, 1940. If that be true, why did he acquiesce in such conduct until 1942 or 1944? The circumstances may have permitted a rescission in June, 1940, with little or no loss. But Wolfe's acquiescence in the alleged breach of the contract by the Gastons will now result in injury to the Gastons. We regard such acquiescance as a waiver of Wolfe's claimed right of rescission. *Holderby v. H. C. Taylor Co., supra; Matney v. Blakely, supra.*

Wolfe does not point out any act or conduct, except the failure on the part of the Gastons to furnish merchandise, which would indicate that the Gastons had renounced or abandoned the contract of May 27, 1940. We do not think such failure, even though not denied, indicates that the Gastons had renounced or abandoned the contract of May 27, 1940. It may be that the failure to furnish the merchandise between the date of the contract and December 31, 1944, would be some evidence of the abandonment of the contract. *Werner v. Hopkins*, 117 W. Va. 727, 188 S. E. 128. But abandonment "must be clearly proved". *Werner v. Hopkins, supra.* And the evidence here is not sufficient to

show abandonment or renunciation by the Gastons. In this connection, we take judicial notice of the fact that the United States of America, during the period here considered, was engaged in a world-wide war, which state of hostilities upsets the economy and creates a scarcity of all commodities. We conclude, in view of all the circumstances surrounding this contract and the conduct of the parties with reference thereto, that the Gastons have not abandoned or renounced their contract with Wolfe; and that the contract of May 27, 1940, is now a valid obligation, binding the parties to this litigation. However, that conclusion does not preclude Wolfe from invoking any remedy at law for the alleged breach of the contract.

The only remaining question to be determined herein involves the sufficiency of the evidence to support the commissioner's report. When facts are determined by a commissioner upon contradictory evidence and approved by the Court, unless the error is palpable, they will not be set aside. *Harwood v. Harwood,* 112 W. Va. 344, 164 S. E. 290; *Werner v. Hopkins, supra.* See *Pickens' Ex'ors v. Daniel,* 58 W. Va. 327, 52 S. E. 215. But "Where the evidence before a commissioner to whom a cause has been referred does not sustain his finding, it ought to be set aside." *Thomas v. Collins,* 93 W. Va. 678, 117 S. E. 489.

In the instant case, the report of the commissioner states that the evidence of Wolfe and one of the Gastons shows that the net income of the market was less than $120.00 a month. Nevertheless, he makes an accounting between the parties on the basis of net profits of $120.00 a month for fifty-five months. In this respect, at least, the report of the commissioner is not sustained by the evidence, and is contradictory. Moreover, the report of the commissioner allows Wolfe compensation for 220 weeks at $15.00 a week, or a total of $3,300.00. This is a palpable error. From May 27, 1940, to December 31, 1944, is 239 weeks and six days, which would entitle Wolfe to compensation of $3,597.86, for that period, regardless of whether any net profits accrued from the market.

It would require omniscience to arrive at an exact and accurate accounting between the litigants based on the record before us. But no reason is perceived which would prevent an impartial accountant from arriving at an approximately correct statement of accounts, using data furnished in good faith and in a spirit of cooperation by the parties to this litigation.

That part of the contract between the Gastons and Wolfe relating to the payment of Wolfe's "guaranteed salary of $15.00 per week" is ambiguous in this respect: It is not clear whether Wolfe's guaranteed salary is to be paid out of the first $120.00 monthly net profits or whether such salary is to be charged as an expense of operating the market. The Gastons, in their audit, do not charge the fixed compensation of Wolfe as a general expense of the market, and only set up a claim to $60.00 out of such monthly net profits. It thus appears that the first $120.00 monthly net profits were devoted to the payment of Wolfe's fixed compensation of $15.00 a week, and that the residue, if any, was to go to the Gastons. The practical construction of the parties is entitled to great, if not controlling, weight. *Litz v. Bank,* 120 W. Va. 281, 197 S. E. 746. We adopt the construction of the parties to this suit as to that part of the contract. See *Alderson v. Fuel Co.,* 116 W. Va. 95, 99, 178 S. E. 626.

In conclusion, we find from this record that Wolfe is entitled to compensation on the basis of $15.00 a week from May 27, 1940, to and including December 31, 1944, or 239 weeks and six days, making a total of $3,597.86. In addition thereto Wolfe is entitled to one-half of the net profits accruing from the operation of the market in excess of $120.00 a month, if such excess exists. The Gastons are entitled to receive that portion of the $120.00 monthly net profits remaining after Wolfe has been paid his guaranteed salary therefrom, and one-half of the net profits in excess of the $120.00 a month.

On this record, we can make no definite finding relative to the purchases of equipment and fixtures used in the

operation of the market. If it be shown that such purchases were made by Wolfe from the proceeds derived from the operation of the market, pursuant to the contract or with the ratification of the Gastons, such purchases would be capital expenditures, chargeable to the Gastons, who, in that event, would own said equipment and fixtures.

Perceiving no error, other than has been herein discussed, and in accordance with the foregoing, the decree of the Circuit Court of Webster County denying Wolfe the right of rescission is affirmed, and in so far as said decree confirms the report of the commissioner in chancery and enters a decretal judgment against Wolfe, the said decree is reversed, and this cause is remanded to that court for further proceedings consistent with this opinion.

*Affirmed in part;*
*reversed in part;*
*and remanded.*