370 S.E.2d 325

**COMMITTEE ON LEGAL ETHICS OF
the WEST VIRGINIA STATE BAR**

v.

**James Wilson DOUGLAS.**

No. 17949.

Supreme Court of Appeals of
West Virginia.

March 7, 1988.

Rehearing Refused May 18, 1988.

First, the respondent publicly criticized an investigation by two circuit judges to inquire into a real estate transaction in which he was involved. The Committee contends that the criticism was "prejudicial to the administration of justice" in violation of DR 1–102(A)(5), and has recommended a six-month suspension. Second, the respondent prepared and filed a civil suit on behalf of a client, Ricky D.M.,[1] to recover a "stud fee." The suit was said to be factually unsupported and contrary to defenses previously raised in a related paternity suit. The disciplinary charges relative to the "stud fee" suit were dismissed.

While we conclude that the First Amendment Free Speech Clause affords protection to an attorney's extrajudicial speech, we remand for a determination of whether the respondent's speech exceeded the scope of protection. We also conclude that the disciplinary charges based upon the "stud fee" suit warrant reconsideration and, therefore, remand those charges for further proceedings.

**I.**

## PUBLIC COMMENTS ON CIRCUIT COURT INVESTIGATION

### *A.*

On July 22, 1985, a general warranty deed was recorded with the Office of the Gilmer County Clerk in which Kenneth Ray Greenlief was seller and Robert W. Minigh was purchaser. The deed was executed by Wayne King, an attorney in Clay County, as attorney-in-fact for Mr. Greenlief. Also recorded were a limited power of attorney [2] and a deed of trust. Various aspects of the transaction were unusual, notably with regard to the prescribed method of payment.[3]

Jack M. Marden, Sherri Goodman Dusic, Charleston, W.Va., for Committee on Legal Ethics.

James Wilson Douglas, Sutton, pro se.

MILLER, Justice:

This is an attorney disciplinary proceeding commenced by the Committee on Legal Ethics against the respondent, James Wilson Douglas, a Braxton County attorney. Multiple disciplinary charges were referred for hearing pursuant to State Bar By–Laws art. VI, § 12. Only two of the charges warrant discussion here.

1. We apply here our usual practice, and decline to provide the surnames of the parties in the "stud fee" suit due to its sensitive nature. *See, e.g., James G. v. Caserta,* 175 W.Va. 406, 408 n. 1, 332 S.E.2d 872, 874 n. 1 (1985).

2. Attached to the power of attorney was a letter by James M. Kyle, M.D., certifying Mr. Greenlief to be of sound mind.

3. While the total consideration for the purchase was $40,000, the cash down payment was only $500. The balance of $39,500 was to be paid, without interest, pursuant to the terms of a promissory note. The note provided for eleven annual installments, including a substantial balloon payment on July 19, 1996. The power of attorney was to expire one year before the final balloon payment was due. The respondent was also designated as the sole trustee under the deed of trust.

All of the documents were prepared by the respondent on behalf of Mr. Greenlief.

The county clerk, aware that Mr. Greenlief had previously been hospitalized for mental illness,[4] brought the documents to the attention of A.L. Sommerville and Danny O. Cline, judges of the Fourteenth Judicial Circuit. On August 14, 1985, the judges jointly entered an order which was admitted to record as a lis pendens. The text of the order recited the mental health history of Mr. Greenlief, the questionable propriety of the transaction, and the involvement of the respondent as attorney for Mr. Greenlief. A special commissioner was appointed to investigate the transaction and to report his findings to the court.

An informal hearing in the Greenlief investigation was scheduled for August 29, 1985. The respondent was unable to attend, apparently due to a previous out-of-town commitment. Mr. Greenlief, Mr. Minigh, and Mr. King, together with their counsel, were in attendance. Two area newspaper reporters sought entrance to the hearing, but were excluded by the judges.[5] At the hearing, the judges orally prohibited the parties from making any comments to the press on the progress of the investigation. This prohibition was not reduced to a written order.

On August 30, 1985, an article appeared in the Braxton Democrat Central, a weekly newspaper. The article was titled "JUDGES SOMMERVILLE–CLINE ORDER INVESTIGATION: DOUGLAS, KING, MINIGH TARGETED," and detailed the charges in the lis pendens order.

A follow-up article appeared on September 6, 1985, under the headline: "DOUGLAS IGNORES GAG ORDER." The respondent was quoted extensively in the article. He attacked the circuit judges for attempting to prohibit public comment on the investigation: "I have much disdain and contempt for the gag order." He also attributed the investigation to "political expediency," and described it as "a farse [sic] and a thinly disguised attempt at 'power jockeying'." He concluded by observing that the judges "drew first blood" and that he would "rise to the challenge."[6]

The newspaper article was accompanied by a photograph of the respondent dressed in military fatigues and armed with a facsimile bow and arrow, a knife, and rifle ammunition. A caption beneath the photograph quoted the respondent and read, in part: "Just like Rambo I'll defend against the judges alone if necessary."

A Notice of Hearing and Statement of Charges was served upon the respondent by the Committee on June 24, 1986. Count III charged, *inter alia*, a violation of DR

---

**4.** Mr. Greenlief's prior commitments were matters of public record in Gilmer County.

**5.** After complaints were lodged with this Court by the newspapers, the court administrator advised the judges by letter that the exclusion of the press from the hearing was a violation of State law. *See generally State ex rel. Herald Mail Co. v. Hamilton,* 165 W.Va. 103, 267 S.E.2d 544 (1980); *see also Nebraska Press Ass'n v. Stuart,* 427 U.S. 539, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976).

**6.** The text of relevant portions of the article is:

"Douglas, later asked why he ignored the proceedings, said, 'I have much disdain and contempt for the gag order.' He explained that one reason for not showing up was that he hadn't received notice until two days prior. 'I had a man coming all the way from Atlanta, Ga to give a deposition in Federal Court in Clendenin and that meeting had been arranged months before hand,' Douglas said.

Douglas said that he furthermore did not recognize the jurisdiction of the court with respect to the real estate transaction and that thirdly, 'I think this whole sorted [sic] affair is nothing but a farse [sic] and a thinly disguised attempt at "power jockeying" ... I'm thoroughly convinced that neither judge gives a hoot or holler about Mr. Greenlief and that they are perfectly willing to sacrifice his right to privacy, his piece [sic] of mind, and all notions of fundamental fairness on the pagan altar of political expediency.'

\* \* \* \* \* \*

"'In essence the whole matter is indicative ... of probably the nationwide trend that people are beginning to speak out against judges. They are no longer regarded as provincial dieties [sic]. It would appear to me from this whole affair that the Salem witch trials of 17th Century England are still with us.'

"As far as I'm concerned the judges drew first blood. If a battle is inevitable, then I will rise to the challenge."

1–102(A)(5) [7] by virtue of the respondent's comments to the press and photograph. Hearings on the various disciplinary charges were held before a subcommittee of the Hearing Panel during the months of August and September, 1986. The subcommittee determined in a written report that the respondent's conduct violated DR 1–102, and recommended a six-month suspension. While the subcommittee recognized the right of a lawyer to "freely express his opinions," it concluded that the "abusive attack" by the respondent "crossed the threshold" into unprotected speech. The full Hearing Panel adopted the report on October 25, 1986. The Committee, by its verified complaint of March 19, 1987, now seeks imposition of the suspension.

### B.

The Committee's principal position is that the public statements by the respondent and the "Rambo" photograph were in violation of DR 1–102(A)(5), which provides:

"*Misconduct*—(A) A lawyer shall not:

\* \* \* \* \* \*

(5) Engage in conduct that is prejudicial to the administration of justice."

We begin with some general observations about public comment and criticism by lawyers. There appears to be rather unanimous agreement that general criticism of judges, their opinions, and court procedures, even if harsh and strident, will not result in a violation of the Code of Professional Responsibility. Annot., 12 A.L.R.3d 1408 (1967). The more troublesome area involves criticism which becomes personally abusive and lacks any factual basis.

A distinction is also made because of the differences in language between the general standard in DR 1–102(A)(5), conduct that is "prejudicial to the administration of jus-

tice," and the more detailed strictures contained in DR 7–107, which govern counsel's extrajudicial comments with regard to pending litigation in which he is involved. It appears these more detailed rules rest, at least in the criminal area, on the constitutional right to a fair trial, as the New Jersey Supreme Court summarized in *In Re Hinds*, 90 N.J. 604, 615, 449 A.2d 483, 489 (1982):

"There can be no doubt that the State has a substantial interest in ensuring the fairness of judicial proceedings.... This interest does not belong to the defendant alone. The public also has an interest in a fair trial that cannot be imperiled or diminished by out-of-court assertions by either defense or prosecution lawyers.... Thus, courts have recognized that restricting the extra-judicial statements of criminal defense attorneys relates to the government's substantial interest in preserving the proper administration of justice and the basic integrity of the judicial process." (Citations omitted).

In this case, we need not consider the implications of DR 7–107 because the respondent was not charged under this Canon.[8] He was also not charged with violating DR 8–102(B), which provides that "[a] lawyer shall not knowingly make false accusations against a judge or other adjudicatory officer." [9]

There also appears to be general agreement that the "prejudicial to the administration of justice" standard contained in DR 1–102(A)(5) is not unconstitutionally vague. This is because the standard is considered in light of the traditions of the legal profession and its established practices. *See Parker v. Levy*, 417 U.S. 733, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974); *In Re Ruffalo*, 390 U.S. 544, 88 S.Ct. 1222, 20

---

**7.** The Committee also cited a violation of DR 1–102(A)(6), which prohibits "conduct that adversely reflects on [an attorney's] fitness to practice law."

**8.** For differing views as to the constitutional scope of DR 7–107, *see, e.g., Hirschkop v. Snead*, 594 F.2d 356 (4th Cir.1979); *Chicago Council of Lawyers v. Bauer*, 522 F.2d 242 (7th Cir.1975),

*cert. denied*, 427 U.S. 912, 96 S.Ct. 3201, 49 L.Ed.2d 1204 (1976).

**9.** As we point out *infra*, this language derives from the constitutional standard applied to the libel of public officials under *New York Times v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964).

L.Ed.2d 117 (1968). The court in *In re Keiler*, 380 A.2d 119, 126 (D.C.App.1977), in upholding the constitutionality of the rule against a vagueness claim, stated: "The rule was written by and for lawyers. The language of a rule setting guidelines for members of the bar need not meet the precise standards of clarity that might be required of rules of conduct for laymen." *See also State v. Martindale*, 215 Kan. 667, 527 P.2d 703 (1974).

Another general observation which can be made is that most of the disciplinary cases involving attorneys speaking critically of the judiciary or the judicial system are brought under DR 1–102(A)(5). In the majority of these cases, the courts have not been attentive to First Amendment free speech guidelines. Annot., 12 A.L.R.3d 1408 (1967); *cf.* Annot., 68 A.L.R.3d 273 (1976). Instead, they have focused on whether the speech would undermine public confidence in the judicial system. *E.g., In Re Friedland*, 268 Ind. 536, 376 N.E.2d 1126 (1978); *In Re Paulsrude*, 311 Minn. 303, 248 N.W.2d 747 (1976); *In Re Lacey*, 283 N.W.2d 250 (S.D.1979); *In Re Raggio*, 87 Nev. 369, 487 P.2d 499 (1971).

Part of this inattention to the First Amendment arises from the lack of any clear precedent from the United States Supreme Court. It has not expressly decided whether the strictures of the Code of Professional Responsibility, which are aimed at curbing lawyers' criticism of the judiciary or the judicial system, are to be interpreted in light of First Amendment free speech protection.

The closest case, perhaps, is *Garrison v. Louisiana*, 379 U.S. 64, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964), which involved a criminal libel conviction against a Louisiana district attorney. At a press conference, the attorney attacked local state judges as being lazy and incompetent. He also claimed that spending restrictions imposed on his office by the judges had impaired vice investigations and suggested the possibility of racketeering influences on the part of the judges.

The Supreme Court set aside the conviction and held Louisiana's criminal libel statute to be unconstitutional under *New York Times v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). It adopted *Sullivan*'s central principle that "forbids the punishment of false statements [against public officials], unless made with knowledge of their falsity or in reckless disregard of whether they are true or false." 379 U.S. at 78, 85 S.Ct. at 217, 13 L.Ed.2d at 135.

The Supreme Court in *In Re Snyder*, 472 U.S. 634, 105 S.Ct. 2874, 86 L.Ed.2d 504 (1985), had an opportunity to address the free speech question when a federal court suspended an attorney for authoring a letter critical of the low fees paid for representing indigent criminal defendants. However, it declined to discuss the First Amendment claim, stating that "[w]e avoid constitutional issues when resolution of such issues is not necessary for disposition of a case." 472 U.S. at 642, 105 S.Ct. at 2880, 86 L.Ed.2d at 512. While finding the letter to be harsh and ill-mannered, the Supreme Court concluded that it was neither contemptuous nor contumacious and, consequently, a suspension was not warranted. It also observed the letter was a criticism of the legal system, was not directed as a personal attack, and was one isolated incident.[10]

In light of the Supreme Court's position, state courts have been rather tentative in the application of First Amendment free speech protections. It does appear that the California Supreme Court in *Ramirez v. State Bar*, 28 Cal.3d 402, 169 Cal.Rptr. 206, 619 P.2d 399 (1980), has afforded free

---

**10.** Much the same approach was taken in *In Re Sawyer*, 360 U.S. 622, 79 S.Ct. 1376, 3 L.Ed.2d 1473 (1959), where a lawyer criticized the conduct of a trial as "horrible and shocking," commented on the impossibility of the defendant receiving a fair trial, and stated that the government's case could be proved only by "scrapping" the rules of evidence. The Supreme Court did not undertake a First Amendment analysis, but concluded simply that the remarks were not sufficient to warrant a charge of professional misconduct. Justice Stewart, whose concurrence added the fifth vote, indicated he joined on the basis that there was no intimation in the opinion that First Amendment free speech would immunize a lawyer's unethical conduct.

speech protection to a disciplinary charge based on a lawyer's criticism of a court. The majority upheld the charge because the statements were found either to be knowingly false or made with reckless disregard of the truth and, therefore, did not enjoy constitutional protection under *Garrison*. It would also appear that Illinois and New York have impliedly adopted this standard. *In Re Jafree*, 93 Ill.2d 450, 67 Ill.Dec. 104, 444 N.E.2d 143 (1982); *Baker v. Monroe County Bar Ass'n*, 34 A.D.2d 229, 311 N.Y.S.2d 70 (1970), *aff'd mem.*, 28 N.Y.2d 977, 323 N.Y.S.2d 837, 272 N.E.2d 337, *cert. denied*, 404 U.S. 915, 92 S.Ct. 229, 30 L.Ed.2d 190 (1971).[11] *See also McMilian v. Rennau*, 619 S.W.2d 848 (Mo. App.1981); Annot., 30 A.L.R.4th 141 (1984).

The New Jersey Supreme Court has attempted a rather extended analysis of attorney free speech in *In Re Hinds, supra,* and *In Re Rachmiel*, 90 N.J. 646, 449 A.2d 505 (1982). It concluded that DR 7–107 strictures applied only to attorneys connected with litigation. Because of the compelling state interest to provide a fair trial, their speech could be regulated if there was a "reasonable likelihood" that the lawyer's extrajudicial statements would prevent a fair trial.

With regard to the more general standard imposed in DR 1–102(A)(5), *Hinds*, 90 N.J. at 634, 449 A.2d at 499, viewed it as covering lawyers who have no connection with litigation and came to this conclusion:

"Because *DR* 1–102(A)(5) applies to an attorney in his capacity as an ordinary citizen, the standard for invoking the rule's sanctions against speech should be that of a 'clear and present danger' or, to use an alternative formulation, a 'serious

and imminent threat' to the fairness and integrity of the judicial system."[12]

The free speech issue also surfaces in contempt cases. Professor Tribe, in his treatise on American Constitutional Law 623 (1978), makes this statement, relying on the principal case of *Bridges v. California*, 314 U.S. 252, 62 S.Ct. 190, 86 L.Ed. 192 (1941): "The Supreme Court has consistently used the 'clear and present danger' standard to determine the constitutionality of contempt citations, in the absence of a prior court order, based on out-of-court statements critical of the administration of justice in on-going judicial proceedings."

Also noted by Tribe are several Supreme Court cases dealing with in-court statements in which the Court found that the speech involved did not satisfy the clear and present danger test. *E.g., Eaton v. Tulsa*, 415 U.S. 697, 94 S.Ct. 1228, 39 L.Ed.2d 693 (1974); *In Re Little*, 404 U.S. 553, 92 S.Ct. 659, 30 L.Ed.2d 708 (1972). Neither of these cases involved attorneys. In *Little*, however, the defendant proceeded pro se and the Court stated that "[h]e was therefore clearly entitled to as much latitude in conducting his defense as we have held is enjoyed by counsel vigorously espousing a client's cause. *In Re McConnell*, 370 U.S. 230, 82 S.Ct. 1288, 8 L.Ed.2d 434 (1962)." 404 U.S. at 555, 92 S.Ct. at 660, 30 L.Ed.2d at 710.[13] We have taken much the same approach in a lawyer contempt case in *State v. Boyd*, 166 W.Va. 690, 276 S.E.2d 829 (1981), where we cited *McConnell* and concluded in Syllabus Point 2:

"The rule with regard to contempt of court by an attorney begins with a recognition, that under our adversary system of justice, zealous advocacy on the part

---

**11.** At least one court has concluded that the *Garrison–New York Times* standard does not apply in a disciplinary proceeding under DR 8–102(B). *State v. Nelson,* 210 Kan. 637, 504 P.2d 211 (1972).

**12.** The clear and present danger test for free speech runs through earlier Supreme Court cases. *E.g., Craig v. Harney,* 331 U.S. 367, 67 S.Ct. 1249, 91 L.Ed. 1546 (1947); *Bridges v. California,* 314 U.S. 252, 62 S.Ct. 190, 86 L.Ed. 192 (1941). It is traceable to Justice Holmes'

language in *Schenck v. United States,* 249 U.S. 47, 52, 39 S.Ct. 247, 249, 63 L.Ed. 470, 473 (1919), "the words used are used in such circumstances and are of such a nature as to create a clear and present danger that they will bring about the substantive evils that Congress has a right to prevent."

**13.** In *McConnell,* an attorney was found in contempt because he persisted in trying to vouch the record to present facts in order to show the basis for the court's erroneous ruling.

of an attorney must be permitted. Consequently, it is only when his conduct is boisterous or disrespectful to the degree that it constitutes an imminent threat to the administration of justice that summary punishment for contempt will be authorized."

There appears to be a further analogy to those cases where public employees have spoken out on public issues, particularly against their superiors, and have received disciplinary sanctions. Beginning at least with *Pickering v. Board of Educ.*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), the Supreme Court has recognized the existence of First Amendment protection and concluded: "[W]e hold that, in a case such as this, absent proof of false statements knowingly or recklessly made by him, a teacher's exercise of his right to speak on issues of public importance may not furnish the basis for his dismissal from public employment." 391 U.S. at 574–75, 88 S.Ct. at 1738, 20 L.Ed.2d at 821. (Footnote omitted).

The Court pointed out in *Pickering* that the speech did not impede the employee's proper performance of duties nor did it interfere with the orderly operation of the employee's place of employment. These concerns, as well as what may be a "public issue" have been the subject of further refinement. *See, e.g., Rankin v. McPherson*, 483 U.S. 378, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987); *Connick v. Myers*, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983); *Givhan v. Western Line Consol. School Dist.*, 439 U.S. 410, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979). The free speech principles embodied in *Pickering* and its progeny are not foreign to our law. *E.g., Orr v. Crowder*, 173 W.Va. 335, 315 S.E.2d 593 (1983), *cert. denied*, 469 U.S. 981, 105 S.Ct. 384, 83 L.Ed.2d 319 (1984) (teacher could not be discharged for adverse comments on library reorganization plan); *Gooden v.*

*Board of Appeals*, 160 W.Va. 318, 234 S.E.2d 893 (1977) (police officer could not be discharged for public criticism of superiors).

It is perhaps not without significance that the Supreme Court in *Connick*, 461 U.S. at 145, 103 S.Ct. at 1689, 75 L.Ed.2d at 718, quoted this passage from *Garrison:* " '[S]peech concerning public affairs is more than self expression; it is the essence of self-government.' *Garrison v. Louisiana*, 379 U.S. 64, 74–75 [85 S.Ct. 209, 216, 13 L.Ed.2d 125, 133] (1964)." While it is true that a lawyer's relationship to the court system is not that of employer-employee, there are through tradition and the Code of Professional Responsibility bonds which may be likened to such a relationship. It is traditionally held that lawyers are officers of the courts in which they practice and are subject to their supervision, as we outlined in *West Virginia State Bar v. Earley*, 144 W.Va. 504, 518–19, 109 S.E.2d 420, 430 (1959):

> "Attorneys at law are officers of the court and as such their conduct is subject to supervision by the court.... Attorneys as officers of the court are in effect a part of the judicial system of the State.... The customary functions of attorneys at law bear an intimate relation to the administration of justice by the courts." (Citations omitted).

Much the same obligation to deal in good faith that underlies the master-servant relationship [14] and principal-agent relationship [15] exists as between the lawyer and the judge or court before whom he practices by virtue of DR 7–102. This rule forbids a lawyer from filing frivolous or harassing claims and defenses. It also precludes him from concealing critical facts, offering false testimony or statements, or engaging in any kind of fraudulent activity.[16]

---

**14.** 53 Am.Jur.2d, *Master and Servant* § 97 (1970).

**15.** *E.g., Gaston v. Wolfe*, 132 W.Va. 791, 53 S.E.2d 632 (1949).

**16.** DR 7–102 states:

"(A) In his representation of a client, a lawyer shall not:

"(1) File a suit, assert a position, conduct a defense, delay a trial, or take other action on behalf of his client when he knows or when it is obvious that such action would serve merely to harass or maliciously injure another.

There is a further point in the area of public employee free speech law that bears emphasizing, which was summarized in *Connick*, 461 U.S. at 146, 103 S.Ct. at 1690, 75 L.Ed.2d at 719: "When employee expression cannot be fairly considered as relating to any matter of political, social, or other concern to the community, government officials should enjoy wide latitude in managing their offices without intrusive oversight by the judiciary in the name of the First Amendment."

■ It is apparent that most criticism of the court system, its procedures, or judges would be a matter of public or community concern and would, therefore, enjoy First Amendment protection under *Pickering*'s principles. First Amendment protection is also suggested by the contempt cases which we have earlier analyzed. From the foregoing, we conclude that the Free Speech Clause of the First Amendment protects a lawyer's criticism of the legal system and its judges, but this protection is not absolute. As the New Jersey Supreme Court recognized and the contempt cases bear out, a lawyer's speech that presents a serious and imminent threat to the fairness and integrity of the judicial system is not protected.

■ It is apparent that when a personal attack is made upon a judge or other court official, such speech is not protected if it consists of knowingly false statements or false statements made with a reckless disregard of the truth. This exception is found both in *Garrison* and *Pickering* and

is the defamation standard for public officials found in *Sullivan v. New York Times, supra.*

■ Furthermore, we believe that statements that are outside of any community concern, and are merely designed to ridicule or exhibit contumacy toward the legal system, may not enjoy First Amendment protection. Admittedly, this latter exception is difficult to define and, in view of the public interest in the judiciary and judicial system, should be narrowly construed. We acknowledge the following statement from *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626, 647–48, 105 S.Ct. 2265, 2280, 85 L.Ed.2d 652, 670 (1985):

"More fundamentally, although the State undoubtedly has a substantial interest in ensuring that its attorneys behave with dignity and decorum in the courtroom, we are unsure that the State's desire that attorneys maintain their dignity in their communications with the public is an interest substantial enough to justify the abridgment of their First Amendment rights. Even if that were the case, we are unpersuaded that undignified behavior would tend to recur so often as to warrant a prophylactic rule."

In *Zauderer*, the issue raised was whether an attorney's advertisement, which involved a direct reference to the Dalkon Shield litigation, contained a diagram of the shield, and set out the attorney's fee schedule, was entitled to First Amendment protection. The Supreme Court, characterizing the advertisement as commercial speech entitled to a lesser degree of protec-

"(2) Knowingly advance a claim or defense that is unwarranted under existing law, except that he may advance such claim or defense if it can be supported by good faith argument for an extension, modification, or reversal of existing law.

"(3) Conceal or knowingly fail to disclose that which he is required by law to reveal.

"(4) Knowingly use perjured testimony or false evidence.

"(5) Knowingly make a false statement of law or fact.

"(6) Participate in the creation or preservation of evidence when he knows or it is obvious that the evidence is false.

"(7) Counsel or assist his client in conduct that the lawyer knows to be illegal or fraudulent.

"(8) Knowingly engage in other illegal conduct or conduct contrary to a Disciplinary Rule.

"(B) A lawyer who receives information clearly establishing that:

"(1) His client has, in the course of the representation, perpetrated a fraud upon a person or tribunal shall promptly call upon his client to rectify the same, and if his client refuses or is unable to do so, he shall reveal the fraud to the affected person or tribunal, except when the information is protected as a privileged communication.

"(2) A person other than his client has perpetrated a fraud upon a tribunal shall promptly reveal the fraud to the tribunal."

tion, concluded that it was nevertheless protected from a disciplinary sanction for improper advertising. The foregoing quotation centered on whether the diagram violated the requirements under DR 2–101(B) that illustrations accompanying attorney advertisements be dignified. The Supreme Court found as a fact that the diagram was dignified.

■ Turning to the public statements at issue in this case, this much is certain: they were inappropriate, vexatious, and displayed a lack of professionalism. Moreover, the respondent's conduct in deliberately posing as "Rambo," with artifically contrived accouterments, is at the least undignified and ridiculous. It also appears that the Committee as well as the parties did not have the benefit of any direct guidance concerning attorney free speech. This has been the first occasion that we have had to address this rather complex subject. We do not imply any criticism of either the Committee or the parties when we state that because of this fact, the record in this area is not sufficiently developed for us to reach a final decision.

The New Jersey Supreme Court encountered a similar procedural problem in *Hinds* and the court was divided on the question of whether to remand the case for further development in light of their new constitutional free speech standard. A majority declined to remand, but in *Hinds*, there was no personal attack on the judge as is the case here.

We believe a remand for further development of the facts in light of the standards established herein is appropriate. As we more fully develop in Section II–B, we possess the power to remand under our general authority to regulate and supervise the practice of law. *E.g., Lane v. West Virginia Bd. of Bar Examiners*, 170 W.Va. 583, 295 S.E.2d 670 (1982); *West Virginia State Bar v. Earley*, 144 W.Va. 504, 109 S.E.2d 420 (1959); *see also* W.Va.Code, 51–1–4a.

## II.

### "STUD FEE" SUIT

#### A.

On October 13, 1983, Ida J.S. filed a paternity suit against Ricky D.M. in the Circuit Court of Clay County. Ricky retained the respondent as his attorney and, after a brief consultation, an answer was prepared and filed. That answer asserted various affirmative defenses: (1) Ricky was physically absent from the geographic area at conception; (2) Ricky was actually and statistically sterile; (3) coitus occurred outside of the vagina; (4) Ida had engaged in sexual intercourse with other unnamed persons; and (5) the child had racial and hereditary characteristics dissimilar to Ricky's.

On August 17, 1984, at the recommendation of the respondent, Ricky brought a civil suit against Ida. The complaint averred that in or about December, 1982, Ida desired to bear a child, but was "unable to obtain a suitable mate." Thereafter, Ida met Ricky, who was described as a man of "virile masculinity." The parties did "explicitly or implicitly enter into a contract" by which Ricky was to impregnate Ida. Should the birth of a normal child be accomplished, Ricky was to receive a "stud fee" of an unspecified amount, "in legal tender or an acceptable medium of exchange."

The complaint sought $5,000 in compensatory damages, which was represented to be the price a female infant would bring through the services of an adoption agency. It also sought damages for intentional infliction of mental distress and visitation rights.

Ida denied the material averments of the "stud fee" complaint in her answer, and moved to strike portions of the complaint as violative of Rule 11, W.Va.R.C.P., and as scandalous matter under Rule 12(f), W.Va. R.C.P. The respondent followed with a motion to strike the answer. Though it appears a hearing on the various motions was held, there is no record of a ruling by the court. On December 10, 1984, four months after the complaint was filed, Ricky signed an acknowledgement of his duty to support Ida's infant child. The "stud fee" suit was dismissed with prejudice shortly thereafter pursuant to Rule 41(a), W.Va. R.C.P.

Count I of the Notice of Hearing and Statement of Charges, which was based upon the "stud fee" suit, cited violations of ten disciplinary rules.[17] The Hearing Panel dismissed the charge.

### B.

We discuss at the threshold our authority to review the "stud fee" charge. Under our disciplinary procedures, the Investigative Panel of the Committee on Legal Ethics must undertake to investigate all complaints of attorney misconduct. If the Investigative Panel determines there is probable cause to support the disciplinary charge, it is referred to a Hearing Panel. State Bar By-Laws art. VI, § 12. A proceeding is instituted in this Court only if the Hearing Panel determines that "the case merits a public reprimand or the suspension or annulment of the license of the accused [attorney]." Its records and findings become the Committee's report. State Bar By-Laws art. VI, §§ 17 & 18. We have not had occasion to address the breadth of our authority to review disciplinary charges which have been dismissed by the Hearing Panel.

■ Our cases have consistently recognized the inherent power of this Court to supervise the practice of law in West Virginia. *E.g., West Virginia State Bar v. Earley, supra; State ex rel. Partain v. Oakley,* 159 W.Va. 805, 227 S.E.2d 314 (1976); *see also* W.Va.Code, 51–1–4a (statutory recognition of inherent supervisory power). With the adoption of the Judicial Reorganization Amendment of 1974, that supervisory power attained constitutional status. *Lane v. W.Va. Bd. of Law Examiners, supra; State ex rel. Askin v. Dostert,* 170 W.Va. 562, 295 S.E.2d 271 (1982). As we stated in Syllabus Point 1 of *Askin:*

"The exclusive authority to define, regulate and control the practice of law in West Virginia is vested in the Supreme Court of Appeals."

To more effectively process charges of attorney misconduct, this Court authorized the creation of the Committee on Legal Ethics and equipped it with investigative and prosecutorial powers. The Committee, however, remains an administrative agency of the Court and is subject to our direct supervision. State Bar By–Laws art. VI, § 4.[18] It is not an adjudicatory body, and its recommendations for discipline in ethics cases are merely advisory. Its rules of procedure are subject to our approval. For this reason, we have recognized that the adoption by this Court of rules to be applied in attorney disciplinary cases does not operate to diminish or displace our inherent supervisory power, as we discussed in *In Re Brown,* 164 W.Va. 234, 239, 262 S.E.2d 444, 447 (1980):

"Even though the Bar By-laws are subject to the approval of this Court under W.Va.Code, 51-1-4a, this does not mean that upon their approval they become the sole standard to define and control the practice of law and regulate the conduct of attorneys. If this Court were to hold that the Bar By-laws were the only source of power regulating the practice of law, it would abdicate its inherent responsibilities and the express mandate of W.Va.Code, 51-1-4a."

■ We have, in the past, exercised our inherent power to supplement rules and procedures in attorney disciplinary cases. *E.g., In Re L.E.C.,* 171 W.Va. 670, 301 S.E.2d 627 (1983) (authorized court review of private reprimand where rules were silent); *West Virginia State Bar v. Earley, supra* (court empowered to enjoin unautho-

---

**17.** These violations included: DR 1–102(A)(5) (conduct prejudicial to the administration of justice); DR 1–102(A)(6) (conduct which adversely reflects on fitness to practice law); DR 2–109(A)(1) & (2) (acceptance of employment on behalf of one who wishes to pursue a vexatious or frivolous matter); DR 7–102(A)(5) (knowingly making a false statement); DR 7–106(A) (disregard of a rule of a tribunal); DR 7–106(C)(1) (stating matter to tribunal unsup-

ported by evidence); DR 7–106(C)(7) (intentionally violating rule of procedure).

**18.** The relevant portion of Article VI, Section 4 of the State Bar By–Laws is: "In the performance of its duties under the provisions of this Article VI, the committee on legal ethics should be the instrumentality of the supreme court of appeals for the supervision of the conduct of lawyers who are its officers."

rized practice of law); *In Re Brown, supra* (supplemented rules to require hearing on suitability of applicant for readmission). Other courts with disciplinary procedures similar to our own have also held that the adoption of those procedures does not divest the court of its inherent power to supervise and regulate the bar. *E.g., Colo. R.C.P.,* 241.15(c) (court retains plenary power to review any determination in disciplinary cases); *In Re Crane,* 96 Ill.2d 40, 70 Ill.Dec. 220, 449 N.E.2d 94 (1983); *Committee on Professional Ethics v. Crary,* 245 N.W.2d 298 (Iowa 1976); *In Re Belser,* 269 S.C. 682, 239 S.E.2d 492 (1977) (appropriate disciplinary action rests upon supreme court alone). We, therefore, conclude that this Court may in appropriate circumstances exercise its inherent supervisory power to review attorney disciplinary charges for which the Committee has not recommended discipline.

### C.

As was pointed out above, the Committee relies upon a number of disciplinary rules in support of the "stud fee" charge. We believe, however, that the issues presented are subsumed by DR 7–102(A)(1) and 7–102(A)(2), which provide, in part:

"In his representation of a client, a lawyer shall not:

"(1) File a suit ... on behalf of his client when he knows or when it is obvious that such action would serve merely to harass or maliciously injure another.

"(2) Knowingly advance a claim or defense that is unwarranted under existing law, except that he may advance such claim or defense if it can be supported by good faith argument for an extension, modification, or reversal of existing law."

These two rules cannot be read in a vacuum, but rather must be considered in light of other related measures to curb lawyer abuses. There is, for example, a direct historical link with Rule 11, F.R.C.P. Under our counterpart to Rule 11, a lawyer who signs a pleading or other paper thereby certifies that it (1) is well grounded in fact and law, (2) is not interposed for any improper purpose, and (3) is not a "wilful violation" which can subject the attorney to an "appropriate disciplinary action."[19] Also of assistance are cases which impose liability upon lawyers for malicious prosecution where a suit lacks "probable cause" and is brought for an improper purpose.[20] We must, therefore, give appropriate weight to these sources in our interpretation of the disciplinary rules.

Having reviewed the relevant background of the rules, we proceed to an analysis of DR 7–102(A)(1) and 7–102(A)(2). While the two rules are addressed to similar evils, they serve distinct purposes. DR 7–102(A)(1) is aimed principally at vexatious conduct by lawyers. On the other hand, DR 7–102(A)(2) prohibits the assertion of frivolous claims and defenses, regardless of the lawyer's purpose. To summarize, the former rule prohibits vexatiousness, while the latter prohibits frivolousness.

Under DR 7–102(A)(1), the sole point of inquiry is the lawyer's scienter: One is subject to discipline thereunder only "when he knows or when it is obvious" that the

---

**19.** Rule 11, W.Va.R.C.P., substantially follows the pre–1983 federal rule and in relevant part provides:

"The signature of the attorney first signing a pleading constitutes a certificate by him that he has read it; that to the best of his knowledge, information, and belief there is good ground to support it; and that it is not interposed for delay.... For a wilful violation of this rule an attorney may be subjected to appropriate disciplinary action."

Rule 11, F.R.C.P., was significantly strengthened by amendment in 1983. The amended rule, on its face at least, *mandates* the imposition of an appropriate sanction for any viola-

tion. For a good discussion of the amended rule and an assessment of its impact, *see* Nelken, *Sanctions Under Amended Federal Rule 11— Some "Chilling" Problems In the Struggle Between Compensation and Punishment,* 74 Geo. L.J. 1313 (1986).

**20.** An attorney may be subject to civil liability for malicious prosecution if: (1) a result favorable to the defendant is rendered in the prior suit; (2) the prior suit lacked probable cause; and (3) the prior suit was brought for an improper purpose. Restatement (Second) of Torts § 674, comment d; Annot., 46 A.L.R.4th 249 (1986).

purpose of his conduct is to harass or injure another.

DR 7–102(A)(2) is, as stated above, aimed at frivolousness. We highlight here the twofold focus of the inquiry required under this rule. First, it must be determined whether the claim or defense is, as the rule phrases it, "unwarranted" under the law.[21] This is an objective inquiry and is to be measured by what a reasonable attorney should have known under the circumstances.[22] E.g., Nemeroff v. Abelson, 620 F.2d 339 (2d Cir.1980); Kinee v. Abraham Lincoln Fed. Savings & Loan Ass'n, 365 F.Supp. 975 (E.D.Pa.1973); Sommer v. Carr, 99 Wis.2d 789, 299 N.W.2d 856 (1981). Second, the rule requires a knowing violation, that is, a lawyer must assert the claim or defense with knowledge that it was unwarranted. This is a subjective inquiry, and may be proved directly or circumstantially. Nemeroff v. Abelson, supra; Boyce v. Alizaduh, 595 F.2d 948 (4th Cir.1979); Friedman v. Dozorc, 412 Mich. 1, 312 N.W.2d 585 (1981); Sommer v. Carr, supra.

We have recognized the interrelationship between Rule 11 and DR 7–102(A)(1) and (2) in Daily Gazette Co., Inc. v. Canady, 175 W.Va. 249, 332 S.E.2d 262 (1985). It is also clear that filing frivolous and harassing litigation can lead to disciplinary sanctions including disbarment under DR 7–102(A)(1) and (2). E.g., In Re Sarelas, 360 F.Supp. 794, 795 (N.D.Ill.1973), aff'd, 497 F.2d 926 (7th Cir.1974); Ellis v. Roshei Corp., 143 Cal.App.3d 642, 192 Cal.Rptr. 57 (1983); In Re Jafree, supra; In Re Cairo, 115 Wis. 5, 338 N.W.2d 703 (1983).

 We believe the Hearing Panel misperceived the nature of attorney responsibility under DR 7–102(A)(1) and 7–102(A)(2). The record reveals an utter lack of a basis in fact for the suit and is strongly suggestive of an improper motivation. These issues, however, are more appropriately explored in the first instance by the Hearing Panel as the finder of fact which may, if necessary, supplement the record on remand.

We, therefore, remand both Count I and Count III to the Hearing Panel for reconsideration in light of the principles hereinabove discussed.

Remanded.

MCGRAW, J., did not participate in the decision of this case.

---

21. This is summarized by the comments to ABA Model Rule 3.1 (1981). There, conduct is deemed to be frivolous "if the lawyer is unable either to make a good faith argument on the merits of the action taken or to support the action taken by a good faith argument for an extension, modification or reversal of existing law."

22. The reasonableness inquiry to be applied may be likened to the determination in malicious prosecution cases whether there was probable cause to bring or maintain suit. Restatement (Second) of Torts § 675 provides in part: "One who takes an active part in the initiation, continuation or procurement of civil proceedings against another has probable cause for doing so if he reasonably believes in the existence of the facts upon which the claim is based, and ... correctly or reasonably believes that under those facts the claim may be valid under the applicable law[.]"