452 S.E.2d 75

**The COMMITTEE ON LEGAL ETHICS OF THE WEST VIRGINIA STATE BAR, Complainant,**

v.

**James R. SHEATSLEY, a Member of the West Virginia State Bar, Respondent.**

No. 22287.

Supreme Court of Appeals of West Virginia.

Submitted Sept. 13, 1994.

Decided Nov. 21, 1994.

---

Sherri D. Goodman, Chief Disciplinary Counsel, West Virginia State Bar, Charleston, for complainant.

Erwin L. Conrad, Conrad & Clay, Fayetteville, for respondent.

McHUGH, Justice:

In this attorney disciplinary proceeding, the Committee on Legal Ethics of the West Virginia State Bar (hereinafter "Committee") recommends that this Court order that the respondent, James R. Sheatsley, receive a public reprimand and require the respondent to reimburse the Committee for the costs of the disciplinary proceedings that have occurred herein. The Committee charges the respondent with participating in and acquiescing in the payment of money to a person he later referred to as a witness. We adopt the findings and recommendation of the Committee. For the reasons stated below, we hereby order that the respondent

shall receive a public reprimand, and we further order the respondent to pay all costs associated with the proceedings that have occurred herein.

I

The respondent is a licensed member of the West Virginia State Bar since 1978, and practices in Raleigh County, West Virginia. Legacy One, Inc. (hereinafter "Legacy") was a client of the respondent. Legacy owns fourteen cemeteries, one of which is located in Beckley, West Virginia, called Blue Ridge Memorial Gardens.

In 1987, Legacy suspected that two of its sales representatives, Lamont Gaither and James Clement, were defrauding the company by "fronting" payments for customers on installment contracts even though these customers had no intention of making the remaining payments. As a result, the sales representatives would receive commissions when there were actually no sales. Ultimately, the president of Legacy, Darryl Roberts, fired Mr. Gaither and Mr. Clement.

Mr. Gaither and Mr. Clement, African–Americans, filed race discrimination claims as well as unemployment compensation claims before the Human Rights Commission alleging they were treated differently than white employees who were disciplined less severely for engaging in similar conduct. The two men retained attorney William D. Turner to represent them. Mr. Turner later withdrew from his representation of Mr. Clement due to a potential conflict between Mr. Gaither and Mr. Clement. In the meantime, the respondent began formulating Legacy's defense by contacting an investigative agency and hiring a private investigator, Michael Gosnell.

Thereafter, Mr. Clement approached Legacy and settled his case. The respondent subsequently prepared the settlement documentation. On December 24, 1987, Legacy settled with Mr. Clement for $4,000. Also in December, Mr. Gosnell submitted to the respondent a report that was favorable to Mr. Clement and Mr. Gaither.

On June 3, 1988, the hearing examiner in the discrimination case issued a recommended decision that found Mr. Gaither had been discharged on the basis of his race. Later in June, Mr. Clement revealed to a Legacy employee, Paul Roop, that he knew why Legacy had lost the case brought by Mr. Gaither.

On June 27, 1988, the respondent met with Mr. Clement with Mr. Roop present. Mr. Clement hinted that Mr. Gosnell's investigation had been tainted, but Mr. Clement related to the gentlemen that he wanted to be compensated for what he knew.

Legacy then reached an agreement with Mr. Clement that he would be compensated for divulging what he knew. There is a dispute as to the characterization of the fee. The respondent referred to the payment as an investigative fee while Mr. Roberts, the president of Legacy, claimed Mr. Clement was an informant and being compensated for rendering such services.

In order to prevent Mr. Clement from changing his story, Legacy agreed to pay him $3,250 immediately and $3,250 upon a favorable completion of the case. The respondent prepared a document to supplement the original settlement agreement to reflect this new agreement. While the agreement noted the possibility that Mr. Clement may be called as a witness, Mr. Clement was opposed to testifying at the hearing for fear of Mr. Gaither.[1] After sign-

---

1. The relevant language set forth in the supplement agreement reads as follows:

    2. The parties agree that an additional sum of money shall be paid to James Clement as part and parcel of the Settlement Agreement entered into effective December 24, 1987, in exchange for valuable consideration to be provided by the said James Clement as relates to the settlement of the Human Rights Commission Case and also as relates to other matters involving employees and former employees of Legacy One Inc.

    3. The total sum of money to be paid to James Clement as consideration for entry into this supplement agreement is the sum of Six Thousand Five Hundred Dollars ($6,500.00).

    4. Of the total sum paid the sum of Three Thousand Two Hundred Fifty Dollars ($3,250.00) shall be paid on the same of execution of this Agreement and the balance shall be paid at such time as the case now pending before the Human Rights Commission in the matter of Lamont Gaither vs Legacy One Inc.,

ing the agreement, Mr. Clement revealed the fact that Mr. Gaither had conspired with Mr. Gosnell to create untruthful questionnaire answers with respect to the survey of customers who were originally called upon by Mr. Clement and Mr. Gaither.

On June 30, 1988, Legacy filed a motion for reopening of Mr. Gaither's case before the Human Rights Commission based upon the newly discovered evidence. The motion was granted and the case was remanded on September 16, 1988. However, between the filing and the granting of the motion, Mr. Clement began demanding more money.

A meeting was called at the respondent's request. Those attending included Messrs. Robert, Roop, Clement and John Hutchison. Mr. Hutchison, a law partner of the respondent, determined that Mr. Clement would not be paid for fear that such a transaction could be viewed as purchasing testimony relevant to Mr. Gaither's case before the Human Rights Commission. Upon Mr. Hutchison's refusal, Mr. Clement demanded the first installment of $3,250. Apparently, Mr. Hutchison then expressed concern that Mr. Clement would not follow through on the terms of the agreement unless the money could remain an incentive. Nevertheless, Mr. Clement made continual demands for the money.[2]

The respondent later subpoenaed Mr. Clement to attend a deposition in April of 1989 regarding Mr. Gaither's case. Mr. Turner thereafter filed requests for information regarding all settlement documents. The respondent finally disclosed the requested information upon an order of the hearing examiner. In November of 1990, the respondent unsuccessfully tried to serve Mr. Clement with a subpoena for the upcoming hear-

ing in Mr. Gaither's case. The respondent offered Mr. Clement's deposition at the hearing since Mr. Clement failed to personally appear. At the conclusion of the hearing, the hearing examiner found for Legacy.

## II

■ We have historically placed the burden of proof on the Committee to prove by full, preponderating and clear evidence the charges contained in the complaint filed on behalf of the Committee as stated in syllabus point 1 of *Committee on Legal Ethics v. Six*, 181 W.Va. 52, 380 S.E.2d 219 (1989):

> ' "In a court proceeding initiated by the Committee on Legal Ethics of the West Virginia State Bar to annul the license of an attorney to practice law, the burden is on the Committee to prove, by full, preponderating and clear evidence, the charges contained in the Committee's complaint." Syl.Pt. 1, *Committee on Legal Ethics v. Pence*, 216 S.E.2d 236 (W.Va. 1975).' Syllabus Point 1, *Committee on Legal Ethics v. Walker*, 178 W.Va. 150, 358 S.E.2d 234 (1987).

We find that the Committee has met this burden.

The Committee contends that the respondent wrongfully participated in the payment of money to a potential witness contingent upon a favorable resolution of the case. The respondent's actions constitute a violation of DR 7–109(C) of the *Code of Professional Responsibility* which states in pertinent part: "A lawyer shall not pay, offer to pay, or acquiesce in the payment of compensation to a witness contingent upon the content of his testimony or the outcome of the case."[3]

---

which was action number ER–260–87, shall be resolved favorably to Legacy One Inc. either through a ruling by the Human Rights Commission in favor of Legacy One Inc. or by the voluntary withdrawal of all proceedings by the Complainant therein, Mr. Lamont Gaither.

. . . .

6. The parties anticipate the possibility that James Clement may be called as a witness in the event there are any further continued hearings either by the Claimant Lamont Gaither, potentially by the Human Rights Commission itself, or if necessary to substantiate other testimony elicited from other witnesses, by Legacy One Inc.

**2.** The record is unclear as to how and when but it is apparent that Mr. Clement did in fact receive money from Legacy pursuant to the terms of the supplemental agreement.

**3.** Disciplinary Rule 7–109(C) of the *Code of Professional Responsibility* further provides:

But a lawyer may advance, guarantee, or acquiesce in the payment of:

(1) Expenses reasonably incurred by a witness in attending or testifying.

(2) Reasonable compensation to a witness for his loss of time in attending or testifying.

(3) A reasonable fee for the professional services of an expert witness.

The Committee relies upon the case of *People v. Belfor*, 197 Colo. 223, 591 P.2d 585 (1979). In *Belfor*, an attorney representing a joint venture was defending a foreclosure on a lien arising out of a construction project. The foreman of the building project approached the client with the attorney present and informed the two men that he possessed information that would prove favorable to their case. But the foreman said he would only reveal the information if a judgment pending against him was satisfied. Ultimately, the attorney settled the judgment and paid the amount of the settlement from funds provided by the joint venture. To ensure that the foreman complied with the agreement, the attorney prepared an installment note which would have been forgiven upon the witness testifying favorably for the joint venture. Ultimately, the foreman refused to testify for the attorney's client.

The Supreme Court of Colorado suspended the attorney for one year and ordered that he pay all costs associated with the proceedings. In support, the court recognized: "'In representing a client, a lawyer is prohibited from counseling or assisting his client in conduct that the lawyer knows to be illegal or fraudulent. It is both illegal and against public policy to pay or tender something of value to a witness in return for his testimony.'" *Id.*, 591 P.2d at 587 (quoting a finding of fact made by the Supreme Court Grievance Committee).

The *Code of Professional Responsibility* was superseded by the *Rules of Professional Conduct* which were adopted and promulgated by this Court on June 30, 1988, effective on and after January 1, 1989. By and through this change, Disciplinary Rule 7–109(C) of the *Code of Professional Responsibility* was replaced with Rule 1.8(k) of the *Rules of Professional Conduct* which extends the earlier definition by stating:

> A lawyer shall not pay, offer to pay, or acquiesce in the payment of compensation to a witness or to anyone referring a lawyer to a witness, contingent upon the content of the witness's testimony or the outcome of the case. But a lawyer may advance, guarantee, or acquiesce in the payment of:
> (1) expenses reasonably incurred by a witness in attending or testifying. ·
> (2) reasonable compensation to a witness for his loss of time in attending or testifying.
> (3) a reasonable fee for the professional services of an expert witness.

The Committee maintains that the respondent's actions are controlling regardless of the respondent's intentions. Mr. Clement was undoubtedly a potential witness as reflected by the agreement drafted by the respondent. *See* note 1, *supra.* Moreover, the agreement entered into by the parties with the respondent's approval contained a confidentiality provision designed to conceal a fact that could bear directly upon the veracity of Mr. Clement's testimony and ultimately Mr. Clement's credibility as a witness.[4] The respondent clearly acquiesced in the payment of money to a potential witness in exchange for favorable testimony leading to a favorable outcome.

The respondent primarily contends that the Committee erred in refusing to give *res judicata* effect to the final decision of the hearing examiner acting on behalf of the Human Rights Commission. *See Conley v. Spillers*, 171 W.Va. 584, 301 S.E.2d 216 (1983).[5] More simply, the respondent argues that had the hearing examiner's decision been considered final with respect to the credibility of the witnesses and the weight given to their testimony, it would be obvious that Mr. Clement could not be viewed as a credible witness upon whose testimony one could be assured a favorable outcome.

We find the respondent's argument to be rather disingenuous in that what effect would a *res judicata* ruling of the hearing examin-

4. Paragraph five of the supplemental agreement contained the following language: "Legacy One Inc. agrees that the supplemental settlement agreement entered into with James Clement will not be discussed by the officers, attorneys, agents or other representatives of Legacy One Inc. with any third party as a part of the civil proceeding in the case of Lamont Gaither."

5. In his brief to support this contention, the respondent apparently refers to the following portion of the hearing examiner's final decision:

> Therefore it is found that Mr. Clement was 'fronting' in an effort to defraud the respondent. It is also found that Mr. Clement and Mr. Gosnell conspired to hinder the respondent's investigation into Mr. Clement's and [Mr. Gaither's] suspected 'fronting.' ...
> It must be specifically noted that the undersigned gave no weight to Mr. Clement's or Mr. Gosnell's testimony on any other issue than set out immediately above.

er's decision have with respect to the fact that the respondent paid a potential witness money? Whether Mr. Clement was in essence adjudicated a credible witness or not does not negate the fact that the respondent paid Mr. Clement money prior to the time the hearing examiner issued his ruling. Moreover, as evident by a review of the hearing examiner's final decision, the credibility of the witnesses was not an issue to be tried before the Human Rights Commission.[6]

On the respondent's behalf, the Committee notes that throughout these proceedings the respondent has been honest and candid; and, the witnesses testifying to the respondent's veracity were credible. With that in mind, the Committee considered the unusual nature of the circumstances that occurred and are under the belief that the respondent would act differently if the circumstances were to arise again. The Committee, therefore, recommends a less severe mode of punishment in the form of a public reprimand.

■ We agree with the Committee's contentions and findings. It is the responsibility of this Court to determine and invoke the appropriate measure of discipline:

' "This Court is the final arbiter of legal ethic problems and must make the ultimate decisions about public reprimands, suspensions or annulments of attorneys' licenses to practice law." Syllabus Point 3, *Committee on Legal Ethics v. Blair*, [174] W.Va. [494], 327 S.E.2d 671 (1984).' Syl. pt. 1, *Committee on Legal Ethics v. Charonis*, 184 W.Va. 268, 400 S.E.2d 276 (1990). Syl. pt. 1, *Committee on Legal Ethics v. Ikner*, 190 W.Va. 433, 438 S.E.2d 613 (1993).

■ Accordingly, Disciplinary Rule 7–109(C) of the *Code of Professional Responsibility*, effective through December 31, 1988, (which has substantively been incorporated into Rule 1.8(k) of the *Rules of Professional Conduct*, effective January 1, 1989) is violated when a lawyer acquiesces in the payment of compensation to a witness contingent upon the content of his testimony or the outcome of the case. Therefore, when the Committee on Legal Ethics of the West Virginia State Bar proves by full, preponderating and clear evidence that a lawyer prepared an agreement that provided for the payment of compensation upon a favorable resolution of the case involving the lawyer's client and such agreement further reflected the possibility that the person to whom the compensation would be given may be a witness in that case, such lawyer is subject to appropriate disciplinary sanctions.[7]

We, therefore, accept the recommendation of the Committee and order that the respondent receive a public reprimand and require the respondent to reimburse the Committee for the actual and necessary expenses incurred by it in connection with this proceeding in the amount of $1,284.83.

Public Reprimand.

BROTHERTON, C.J., did not participate.

MILLER, Retired Justice, sitting by temporary assignment.

CLECKLEY, J., concurs and reserves the right to file a concurring opinion.

CLECKLEY, Justice, concurring:

Although I agree with the majority opinion, I feel compelled to file a concurring opinion to voice my objection to any future expansion of the majority's holding to encompass the area of arrangements for contingent fees for expert witnesses.

In West Virginia, "a contract to pay a witness for testifying[,] coupled with the condition that the right of compensation depends

---

**6.** The appellant raises two additional assignments of error. However, in light of our resolution of the first issue we are of the opinion that the remaining assignments of error are equally lacking in merit, and therefore, we do not find it necessary to expound upon and address those issues.

**7.** The Committee further contends the respondent violated Disciplinary Rule 1–102(A)(5) of the *Code of Professional Responsibility* which provides: "(A) A lawyer shall not: ... (5) [e]ngage in conduct that is prejudicial to the administration of justice." However, because we have found that the respondent specifically violated Disciplinary Rule 7–109(C) of the *Code of Professional Responsibility* we need not address this more general provision asserted by the Committee.

upon the result of the suit in which his testimony is used, is contrary to public policy and void for the reason that it leads to perjury and the perversion of justice." *Ealy v. Shetler Ice Cream Co.*, 108 W.Va. 184, 189, 150 S.E. 539, 541 (1929). (Citations omitted).[1] The impact of this rule on less affluent litigants who seek to engage expert witnesses has combined with the evolution of constitutional doctrines to require a reexamination of our "public policy."

Section 17 of Article III of the West Virginia Constitution provides: "The courts of this State shall be open, and every person, for an injury done to him, in his person, property or reputation, shall have remedy by due course of law; and justice shall be administered without sale, denial or delay." Under our precedents, the Open Courts Clause in Section 17 establishes a right of access to the courts and further embraces an equal protection component with regard to such access. Section 17 "guarantees that all litigants, regardless of financial ability, are entitled to equal access to the judicial system." *Johnson v. Stevens*, 164 W.Va. 703, 706, 265 S.E.2d 764, 766 (1980). Accordingly, we have relied on Section 17, among other things, to confer upon criminal defendants (1) a right to appeal their convictions, *Rhodes v. Leverette*, 160 W.Va. 781, 239 S.E.2d 136 (1977); (2) a right to effective assistance of counsel and to a transcript at the State's expense if a criminal defendant cannot afford them, *Rhodes, supra;* (3) a right to paid counsel for indigents in parole revocation proceedings, *Dobbs v. Wallace*, 157 W.Va. 405, 201 S.E.2d 914 (1974); and (4) a right to consult privately with their attorneys free of obstruction

from prison officials, *State ex rel. McCamic v. McCoy*, 166 W.Va. 572, 276 S.E.2d 534 (1981). We also resorted to Section 17 to hold that any citizen can present a complaint to a grand jury. *State ex rel. Miller v. Smith*, 168 W.Va. 745, 285 S.E.2d 500 (1981).

On the civil side, we have recognized that invoking the jurisdiction of our courts is a fundamental right. Thus, an employee fired because he sued his employer can state a claim for relief for retaliatory discharge. *McClung v. Marion County Comm'n*, 178 W.Va. 444, 360 S.E.2d 221 (1987); *Cf. Webb v. Fury*, 167 W.Va. 434, 282 S.E.2d 28 (1981), *overruled on other grounds, Harris v. Adkins*, 189 W.Va. 465, 468, 432 S.E.2d 549, 552 (1993). Furthermore, the State may not deny a hearing to indigent litigants because they cannot post a double property value bond, *State ex rel. Payne v. Walden*, 156 W.Va. 60, 190 S.E.2d 770 (1972), or pay the costs of service of process by publication. *Johnson, supra.*[2] Finally, Section 17 confers a fundamental right upon civil litigants to represent themselves. *Blair v. Maynard*, 174 W.Va. 247, 324 S.E.2d 391 (1984).

Viewed collectively, our cases applying the Open Courts Clause establish at least two guarantees:[3] (1) the right of civil litigants to obtain judicial hearings of their grievances free from unnecessary obstacles or retaliation, *e.g., McClung, supra; Johnson, supra; State ex rel. Payne, supra;* and (2) the right of criminal defendants not only to trial and appeals but also to meaningful chances for full and fair treatment. Section 17 clearly does not confer the same benefits on civil litigants that it does on criminal defendants.

---

1. See also Rule 3.4(b) of the Rules of Professional Conduct, which states: "A lawyer shall not ... (b) ... offer an inducement to a witness that is prohibited by law[.]" DR 7–109(C) of the former Code of Professional Responsibility provided, in part: "A lawyer shall not pay, offer to pay, or acquiesce in the payment of compensation to a witness contingent upon the content of his testimony or the outcome of the case." EC 7–28 recognized that lawyers may pay an expert witness a reasonable fee for his services as an expert, but added that "in no event should a lawyer pay or agree to pay a contingent fee to any witness."

2. The Legislature also supported the goals of Section 17 by providing, *inter alia*, indigent crim-

inal defendants not only with counsel, but also with investigative services, counsel's travel expenses, and expert witnesses. W.Va.Code, 29–21–1, *et seq.* The State helps indigent civil defendants by supporting legal services for the poor through IOLTA (Interest on Lawyers Trust Accounts) funds and filing fees and by providing for *in forma pauperis* actions.

3. The Open Courts Clause also supplied the basis for other rights unrelated to this case, including a right of the public to attend criminal proceedings, *State ex rel. Herald Mail Co. v. Hamilton*, 165 W.Va. 103, 267 S.E.2d 544 (1980), and to have access to lawyer disciplinary matters. *Daily Gazette Co., Inc. v. Committee on Legal Ethics*, 176 W.Va. 550, 346 S.E.2d 341 (1985).

The relative interests of the two groups are distinct, and special obligations may fairly be imposed on the State in the criminal process. In criminal cases, unlike civil litigation between private citizens, the State is bringing all its power and resources to bear upon individual citizens. Therefore, Section 17 does not impose on the State any duty to provide civil litigants with counsel, transcripts, or expert witnesses. Section 17 does ensure, however, that the State cannot, without adequate justification, erect obstacles to the litigants' ability to secure a meaningful opportunity to present their cases effectively. *E.g., Blair, supra; Johnson, supra.*

Not every regulation of the civil litigation process, however, must give way to ease the litigants' burdens. The State may be able to justify reasonable burdens. When examining whether a governmentally imposed obstacle to meaningful judicial resolution of a claim can satisfy Section 17's rigorous standards, a court should consider: (1) the extent to which the regulation actually obstructs meaningful access; (2) the degree to which the prohibited conduct actually threatens important State interests; and (3) the existence of alternatives that might meet the State's legitimate concerns without imposing the obstacle.

Looking at the first of these factors, the ban on contingent fees for experts can seriously impair the ability of less affluent litigants to effectively present their cases. Unquestionably, and increasingly, in our ever more complex and technical world, litigants need the assistance of experts to establish their claims and defenses. Equally incontrovertible is the fact that experts are expensive. Even if a lawyer advances the money for an expert, the ultimate obligation to pay for the expert normally remains with the litigant. Thus, many litigants who do not have substantial financial resources (i.e., not only the indigent but also a sizeable portion of the great middle class) will either be unable to hire an expert or will be dissuaded from hiring an expert because of the potential liability for paying his or her fee. On the other hand, if the litigants could contract with an expert on a contingent fee basis, they know they will either have the money to pay for the expert, through damage awards, fee-shifting statutes, or, for defendants, from money otherwise needed to pay a judgment, or they will not be liable to pay the fee. As a consequence, our rule against contingent fees for experts discriminates against the less affluent in their ability to obtain a fair and meaningful ruling on their claims and defenses. The discrimination becomes invidious when a person without substantial means must litigate against a well-financed opponent who has hired an expert.[4]

As to the second factor, the State's interests, the State certainly has legitimate and important interests in preventing perjury and the perversion of justice. *See Ealy, supra.* As maintained by the Second Circuit in *Person v. Association of the Bar of the City of New York,* 554 F.2d 534 (2nd Cir.), *cert. denied,* 434 U.S. 924, 98 S.Ct. 403, 54 L.Ed.2d 282 (1977), a legislature rationally may conclude that contingent fees for experts enhance the likelihood that they will embellish their testimony in order to be paid or that the contingent nature of a fee might even induce perjury. *See also, Cresswell v. Sullivan & Cromwell,* 704 F.Supp. 392, 401–02 (S.D.N.Y.1989), *modified on other grounds,* 922 F.2d 60 (2d Cir.1990). Two critical factors, however, distinguish these precedents. First, they did not consider the impact of Section 17. For instance, the Court in *Ealy* did not address any constitutional arguments against the rule. Moreover, the relevant doctrines clearly had not developed when *Ealy* was decided. Likewise, *Person* is not dispositive because that court was bound only by the Federal Equal Protection Clause, under which the contin-

---

**4.** In referring to the usefulness of expert assistance under the "meaningful access to justice" contention in the criminal context, the United States Supreme Court in *Ake v. Oklahoma,* 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), stated that "[w]ith such assistance, ... [a party] ... is fairly able to present at least enough information to the jury, in a meaningful manner, as to permit it to make a sensible determination.... In such a circumstance, where the potential accuracy of the jury's determination is so drastically enhanced, and where the interests of the individual and the State in an accurate proceeding are substantial, the State's interest in its fisc must yield."

gent fee bar needed to satisfy merely the rational basis standard rather than the more rigorous scrutiny required by Section 17. Second, in this case, there is no need for any deference to a legislative judgment. *Ealy* set forth a judge-made rule, and under Sections 1 and 3 of Article VIII of the West Virginia Constitution,[5] this Court has the ultimate and unqualified responsibility for establishing the rules for conducting litigation and for the conduct of the Bar.

While no one could question the legitimacy of preventing perjury and perversion of the judicial process, one seriously could question whether contingent fees for experts would, in fact, create any greater likelihood of causing such evils than our current system. As is presently the case, an expert is retained for litigation only when the expert's opinion supports the position of the engaging litigant. Thus, there is already a built-in economic incentive for experts seeking to be engaged to shape their testimony to fit their contractors' needs. Moreover, many experts have an ongoing (or recurrent) professional relationship with those who hire them or have an economic interest in staying in the good graces of their patrons.

Finally, as to the third factor, an easy alternative is available to counter the potential for perjury, that is, courts may allow, as they already do, opposing parties to cross-examine experts on the nature and size of their fees, and this may be extended to include whether their fees are contingent. Moreover, as John H. Wigmore "consistently [has] maintained[,] ... cross-examination [is] indeed the best vehicle for the discovery of the truth. See [5] *Wigmore on Evidence,* ... § [1367], at [32 (Chadbourn rev. 1974)]. See also *State v. Thomas,* 187 W.Va. 686, [691,] 421 S.E.2d 227[, 232] (1992) ('[c]ross-examination is the engine of truth')." 1 Franklin D. Cleckley, *Handbook on Evidence for West Virginia Lawyers* § 6–6(D)(1) at 655 (3d ed. 1994). Thus, the jury will have the information before it, and the jury can

weigh that information along with all the other evidence presented.

To be sure, some scrutiny of contingent fees for experts must be maintained. Fees certainly must be reasonable both in the rate of pay promised and in their relationship to the services rendered. Thus, a percentage fee, that is a fee promising a percentage of a plaintiff's damage award, would be inherently unreasonable. Such regulatory measures merely emphasize, however, that reasonable alternatives exist to meet the interest of the State in sustaining the integrity of the judicial process without creating obstacles that impair meaningful access to that process for the less fortunate in our State. Moreover, by preventing many litigants from putting their best cases forward, obstacles such as the contingent fee ban might threaten the integrity of the process more than they protect it with their meager or illusory contribution to encouraging honest testimony.

I am authorized to state that Justice NEELY joins in this concurring opinion.

**5.** Section 1 of Article VIII provides: "The judicial power of the State shall be vested solely in a supreme court of appeals and in the circuit courts, and in such intermediate appellate courts and magistrate courts as shall be hereafter established by the legislature, and in the justices, judges and magistrates of such courts."

Section 3 of Article VIII states, in part: "The court shall have power to promulgate rules for all cases and proceedings, civil and criminal, for all of the courts of the State relating to writs, warrants, process practice and procedure, which shall have the force and effect of law."