528 S.E.2d 468

**LAWYER DISCIPLINARY BOARD, Complainant,**

v.

**Richard F. NEELY and Roger D. Hunter, Members of the West Virginia State Bar, Respondents.**

No. 24011.

Supreme Court of Appeals of West Virginia.

Submitted March 24, 1998.

Decided July 15, 1998.

Concurring Opinion of Justice Workman July 17, 1998.

Sherri D. Goodman, Esq., Chief Lawyer Disciplinary Counsel, Charleston, West Virginia, Attorney for the Complainant.

David H. Burton, Esq., Burton & Kilgore, Princeton, West Virginia, Attorney for Neely.

Robert H. Davis, Jr., Esq., Harrisburg, Pennsylvania, Attorney for Hunter.

PER CURIAM: [1]

This disciplinary proceeding was instituted by the complainant, Office of Disciplinary Counsel [hereinafter "ODC"] of the West Virginia State Bar against Roger D. Hunter and Richard F. Neely, members of the Bar. Mr. Hunter and Mr. Neely were charged with violating Rule 3.1 of the West Virginia Rules of Professional Conduct. Mr. Neely was also charged with violating Rule 4.4. However, the Lawyer Disciplinary Board [hereinafter "Board"] found that the ODC only proved that Mr. Hunter and Mr. Neely violated Rule 3.1.[2] The Board recommends admonishment. Based upon our review of the recommendation, all matters of record, and the briefs and argument of counsel, we disagree with the Board's recommendation, and we find that the complaint against Mr. Hunter and Mr. Neely should be dismissed.

I

The proceeding against Mr. Hunter and Mr. Neely involved their representation of Linda and Quewanncoii Stephens. Mr. and Mrs. Stephens have a son, Quinton, who is autistic. In September 1990, when Quinton was approximately nine months old, he was enrolled in the Fort Hill Child Development Center [hereinafter Center].

On December 2, 1994, Mrs. Stephens received a phone call from a staff member at the Center asking her to pick up Quinton because the day care employee who was responsible for his supervision was not at work, and Quinton was disrupting the other children during nap time. When Mrs. Stephens arrived at the Center, she found Quinton alone in the director's office strapped to a posture correcting chair, which she had provided, with his hands and face covered with partly-dried fecal material. According to Mrs. Stephens, the room was dark and the blinds were drawn. The employee who had been watching Quinton claimed that she left him alone for about ninety seconds to get a change of diaper for him. Mrs. Stephens immediately removed Quinton from the Center, and shortly thereafter, she and her husband consulted with Mr. Hunter, who was then practicing law with the law firm of Bowles, Rice, McDavid, Graff and Love.

After meeting with the Stephenses, Mr. Hunter wrote a letter to Jean Hawks, the Center's director and owner, and asked that she have her liability carrier contact him promptly. Mr. Hunter also sent letters of complaint to the state Child Protective Services and the federal Office of Civil Rights. Child Protective Services investigated the matter and concluded that Quinton had not been maltreated because he had been watched by an employee of the Center during the forty-five minutes it took Mrs. Stephens to arrive at the Center. The employee

1. We point out that a per curiam opinion is not legal precedent. See *Lieving v. Hadley*, 188 W.Va. 197, 201 n. 4, 423 S.E.2d 600, 604 n. 4 (1992).

2. This case was heard by a Hearing Panel Subcommittee of the Board.

had only left Quinton alone for ninety seconds when she went to get a diaper.[3]

Subsequently, Mr. Hunter left the law firm of Bowles, Rice, McDavid, Graff and Love and became a partner of Neely & Hunter. Mr. Hunter took the Stephens' case with him, and Mr. Neely took the lead in preparing the pleadings and handling of the case. On June 12, 1995, Mr. Neely filed a civil action in the name of Linda, Quewanncoii, and Quinton Stephens against the Center and Ms. Hawks.

The complaint alleged that Mr. and Mrs. Stephens and Quinton had suffered intentional infliction of emotional distress based upon the outrageous conduct of the defendants and that Quinton had suffered damages from an intentional battery on December 2, 1994. The complaint further alleged that as a result of interviews with persons associated with the Center, the plaintiffs believed that the December 2, 1994 incident was "but one of many instances in which an autistic child, known to have special needs, in direct contravention of the expressed direction of his parents and of his health care providers, knowingly and willfully and intentionally was strapped to a chair in a dark room for many hours and left alone as a result of his mental and physical handicap." The damages clause asked for $1,500,000.00 in compensatory damages and $1,500,000.00 in punitive damages.

Thereafter, Mr. Hunter submitted answers to interrogatories on behalf of the plaintiffs listing the names of several individuals who served as the basis for the allegation that Quinton had in many instances been left alone in a dark room for many hours. However, none of the individuals testified to such incidents during discovery.

On December 11, 1995, the defendants moved for summary judgment. The court dismissed Mr. and Mrs. Stephens causes of action for intentional infliction of emotional distress. The court also dismissed Quinton's claim for intentional infliction of emotional distress for the "many instances" in which he was allegedly strapped in a chair in a dark room for many hours. This claim was dismissed because the only evidence plaintiffs produced during discovery was the testimony of Mary Ellen Davis, Quinton's special education teacher, that one day she found Quinton in the chair in his classroom when all the other children were up and about in the same room. Finally, the claim for punitive damages was dismissed for being duplicative of the claim for damages from intentional infliction of emotional distress. Only Quinton's claim for intentional infliction of emotional distress was permitted to go forward.

Subsequently, the plaintiffs requested a voluntary dismissal of the remaining claim in order to appeal the summary judgment order. The defendants then filed a motion for sanctions under Rule 11 of the West Virginia Rules of Civil Procedure.[4] Thereafter, the parties reached an agreement whereby the plaintiffs agreed to dismiss the appeal and all claims with prejudice in return for the defendants dismissing the Rule 11 motion and agreeing not to seek attorney sanctions against either Mr. Hunter or Mr. Neely.

---

3. The plaintiffs maintained that the Center was in "cahoots" with Child Protective Services and were often notified before an unannounced inspection.

4. At that time, Rule 11 provided, in pertinent part:

The signature of an attorney or party constitutes a certificate by him that he has read the pleading, motion, or other paper; that to the best of his knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law, and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation ... If a pleading, motion, or other paper is signed in violation of this rule, the court, upon motion or upon its own initiative, may impose upon the person who signed it, a represented party, or both, an appropriate sanction, which may include an order to pay to the other party or parties the amount of the reasonable expenses incurred because of the filing of the pleading, motion, or other paper, including a reasonable attorney's fee.

Rule 11 was amended on February 19, 1998, to correspond with Rule 11 of the Federal Rules of Civil Procedure and became effective April 6, 1998.

On March 17, 1997, the Investigative Panel of the Board filed a Statement of Charges in this matter. Mr. Neely was charged with violating Rule 4.4 of the West Virginia Rules of Professional Conduct [5] based on the settlement demand letters he sent to the Center's insurance company.[6] Mr. Neely and Mr. Hunter were both charged with violating Rule 3.1 [7] in that the complaint filed by Mr. Neely asserted emotional distress counts on behalf of Linda and Quewanncoii Stephens, a count of intentional battery on behalf of Quinton Stephens, and a count of emotional distress based on many alleged instances where Quinton had been left alone in a dark room for many hours.

On October 10, 1997, the Hearing Panel Subcommittee issued a report which dismissed the Rule 4.4 charge and by majority vote, found a violation of Rule 3.1 by both Mr. Hunter and Mr. Neely. The Board recommended admonishment. Thereafter, pursuant to Rules 3.11 and 3.13 of the West Virginia Rules of Lawyer Disciplinary Procedure, Mr. Hunter and Mr. Neely filed a notice of objection to the Hearing Panel Subcommittee Report with this Court.[8]

5. Rule 4.4 of the West Virginia Rules of Professional Conduct provides:

> In representing a client, a lawyer shall not use means that have no substantial purpose other than to embarrass, delay, or burden a third person, or use methods of obtaining evidence that violate the legal rights of such a person.

6. On May 26, 1995, Mr. Neely wrote a letter to Karen M. Meyd, senior claims representative for The Maryland Insurance Group, informing her that Mr. Hunter had entered law practice with him. The letter stated that he intended to file a civil action asking for "substantial damages, both compensatory and punitive." The letter further stated:

> I understand from my clients that effective next year, your clients are going to be doing a large amount of special care for the handicapped, particularly wheelchair bound special needs students. Since this law firm tends to be extraordinarily high-profile, and since the mere filing of a complaint may cause your clients unnecessary embarrassment, if you would like to discuss the settlement of this claim before the filing of the suit, I shall be more than pleased to do so.

> In a subsequent letter which included a copy of the proposed complaint and first set of interrogatories and requests for production of documents, Mr. Neely made a settlement demand of $151,516.00 and further stated:

> Although (as you can see from my immediate preparation of the included paperwork) I have little true expectation that this case will settle until right before trial, if at all, I nonetheless believe that it is in everyone's interest to devote the roughly $40,000 that you would need to spend to defend this lawsuit through a nasty trial to the settlement fund. In addition, of course, your client will be spared substantial embarrassment, as this is obviously a case that will attract substantial press attention because of the profile of my clients.

> Both of the parents involved in this case are prominent in the Charleston Community. Quewanncoii Stephens is a retired lieutenant colonel in the United States Army; he was a Ranger, Airborne troop who commanded special forces in Vietnam. LTC Stephens has been awarded two bronze stars and one army commendation medal (valor). LTC Stephens is currently a member of the West Virginia Board of Probation and Parole, and he formerly served as executive director of the West Virginia Human Rights Commission.

7. Rule 3.1 of the West Virginia Rules of Professional Conduct provides, in pertinent part:

> A lawyer shall not bring or defend a proceeding, or assert or controvert an issue therein, unless there is a basis for doing so that is not frivolous, which includes a good faith argument for an extension, modification or reversal of existing law.

8. The ODC did not object to the Board's dismissal of the Rule 4.4 charge against Mr. Neely. Therefore, that issue is not before this Court. However, we are troubled by the threatening content of the letters Mr. Neely sent to the insurance company. While Mr. Neely claims he only intended to facilitate a settlement, his predictions of adverse publicity and a nasty trial were inappropriate and overreaching. The claim that "this law firm tends to be extraordinarily high-profile" and the threat to cause "substantial embarrassment" and "unnecessary embarrassment," along with irrelevant character assertions and claims of high public position (i.e. that one is a member of the West Virginia Board of Probation and Parole and an executive director of the West Virginia Human Rights Commission) are all practices that play no legitimate role in settlement negotiations. We have a large body of law which compels insurance companies to negotiate fairly, and that requirement is a two-edged sword. Simply put, what the lawyer did in this case was unfair and inappropriate.

## II

Pursuant to Rule 3.7 of the Rules of Lawyer Disciplinary Procedure: "In order to recommend the imposition of discipline of any lawyer, the allegations of the formal charge must be proven by clear and convincing evidence." Our standard for reviewing recommendations of the Board regarding sanctioning a lawyer for ethical violations was set forth in Syllabus Point 3 of *Lawyer Disciplinary Bd. v. Cunningham*, 195 W.Va. 27, 464 S.E.2d 181 (1995):

> A *de novo* standard applies to a review of the adjudicatory record made before the [Lawyer Disciplinary Board] as to questions of law, questions of application of the law to the facts, and questions of appropriate sanctions; this Court gives respectful consideration to the [Board's] recommendations while ultimately exercising its own independent judgment. On the other hand, substantial deference is given to the [Board's] findings of fact, unless such findings are not supported by reliable, probative, and substantial evidence on the whole record.

*See also* Syllabus Point 1, *Lawyer Disciplinary Bd. v. Hatcher*, 199 W.Va. 227, 483 S.E.2d 810 (1997). In Syllabus Point 3 of *Committee on Legal Ethics of the West Virginia State Bar v. Blair*, 174 W.Va. 494, 327 S.E.2d 671 (1984), *cert. denied* 470 U.S. 1028, 105 S.Ct. 1395, 84 L.Ed.2d 783 (1985), we noted that: "This Court is the final arbiter of legal ethics problems and must make the ultimate decisions about public reprimands, suspensions or annulments of attorneys' licenses to practice law." *See also* Syllabus Point 7, *Committee on Legal Ethics of the West Virginia State Bar v. Karl*, 192 W.Va. 23, 449 S.E.2d 277 (1994); Syllabus Point 2,

*Committee on Legal Ethics of the West Virginia State Bar v. Sheatsley*, 192 W.Va. 272, 452 S.E.2d 75 (1994).

In this proceeding, the Board found a violation of Rule 3.1 based solely on the allegations set forth in paragraph VII of the complaint.[9] The Board concluded that a reasonable attorney should have known that the allegations set forth in paragraph VII were unwarranted and that Mr. Hunter and Mr. Neely knew they were without basis. In reaching this decision, the Board recognized that the entire lawsuit was not baseless or frivolous because Quinton Stephens' intentional tort claim survived the motion for summary judgment. In effect, the Board seeks to admonish Mr. Hunter and Mr. Neely for factual assertions set forth in a single paragraph of a complaint that later proved to be false.

This case illustrates the difficulties in determining what is a frivolous lawsuit. In *Committee on Legal Ethics of the West Virginia State Bar v. Douglas*, 179 W.Va. 490, 370 S.E.2d 325 (1988), this Court set forth a test to determine whether a lawyer had advanced a frivolous claim. However, the Code of Professional Responsibility was in effect at that time.[10] DR 7–102(A)(2) provided that a lawyer shall not "[k]nowingly advance a claim or defense that is unwarranted under existing law, except that he may advance such claim or defense if it can be supported by good faith argument for an extension, modification, or reversal of existing law." Recognizing that DR 7–102(A)(2) was aimed at frivolousness, this Court set forth a twofold inquiry under the rule. The test first required an objective determination of whether

---

9. Paragraph VII of the complaint stated:
Plaintiffs Linda Stephens and Quewanncoii Stephens have diligently investigated the facts and circumstances surrounding this incident. As a result of interviews with persons associated with Fort Hill Child Development Center, Inc., plaintiffs verily believe that the incident described in paragraph III through VI is but one of *many instances* in which Plaintiff Quinton Stephens, an autistic child, who was known to have special needs, in direct contra-

vention of the express directions of Quinton's parents of his health care providers, was knowingly, willfully and intentionally strapped to a chair in a dark room for many hours and left alone directly as a result of his mental and physical handicap.

10. In 1989, West Virginia replaced the Code of Professional Responsibility with the Rules of Professional Conduct.

the claim or defense was " 'unwarranted' under the law." A more subjective determination of whether the lawyer asserted the claim or defense with knowledge that it was unwarranted completed the inquiry. *Douglas,* 179 W.Va. at 500–01, 370 S.E.2d at 335–36 (citations omitted).

With the adoption of the Rules of Professional Conduct, and more specifically Rule 3.1, an objective standard was established to determine the propriety of pleadings and other court papers.[11] Hazard and Hodes, *The Law of Lawyering, A Handbook on the Model Rules of Professional Conduct* § 3.1:301 (2d ed. 1994 Supp.). Nonetheless, the term "frivolous," now a part of the rule, remains undefined. However, the Comment to the rule is instructive regarding what conduct is permissible and what constitutes frivolousness. The Comment provides, in pertinent part:

> The filing of an action or defense or similar action taken for a client is not frivolous merely because the facts have not first been fully substantiated or because the lawyer expects to develop vital evidence only by discovery. Such action is not frivolous even though the lawyer believes that the client's position ultimately will not prevail. The action is frivolous, however, if the client desires to have the action taken primarily for the purpose of harassing or maliciously injuring a person or if the lawyer is unable either to make a good faith argument on the merits of the action taken or to support the action taken by a good faith argument for an extension, modification or reversal of existing law.

It is obvious that the drafters of the rules acknowledged that when lawyers prepare and file pleadings in civil actions, they routinely make factual allegations in support of their theories of liability and assert defenses in response thereto, some of which ultimately prove to be unsubstantiated. The Comment suggests that these practices do not warrant discipline under Rule 3.1. In fact, federal courts have been reluctant to impose sanctions for such practices under Rule 11.[12] *See Kamen v. American Telephone & Telegraph Co.,* 791 F.2d 1006, (2d Cir.1986) (counsel's reliance on his client's assertion that defendant received funding from the United States government making it subject to suit under the Rehabilitation Act of 1973 constituted a reasonable pre-filing inquiry precluding sanctions); *Kraemer v. Grant County,* 892 F.2d 686 (7th Cir.1990) (sanctions unwarranted where attorney did everything possible to gather information including hiring a private investigator and instituted suit only after hostile attitude of potential defendants made it necessary to use the discovery process to gather additional information).

 While we remain concerned about the increasing number of cases that clog our court dockets, we recognize that there are instances where an attorney has exhausted all avenues of pre-suit investigation and needs the tools of discovery to complete factual development of the case. An action or claim is not frivolous if after a reasonable investigation, all the facts have not been first substantiated. A complaint may be filed if evidence is expected to be developed by discovery. A lawyer may not normally be sanctioned for alleging facts in a complaint that are later determined to be untrue.

As previously discussed, the specific allegations in paragraph VII of the Stephens' complaint were not ultimately supported by the facts developed during discovery. Nonetheless, the record indicates that Mr. Hunter and Mr. Neely conducted a reasonable inves-

---

11. Despite the objective standard, some element of subjectivity remains as a lawyer is not disciplined unless his or her conduct is culpable. Hazard and Hodes, *The Law of Lawyering, A Handbook on the Model Rules of Professional Conduct* § 3.1:301 (2d ed. 1994 Supp.).

12. In *Douglas,* this Court also recognized the interrelationship between DR 7–102(A)(2) and Rule 11 of the West Virginia Rules of Civil Procedure. 179 W.Va. at 500, 370 S.E.2d at 335. While Rule 11 provides a private remedy, Rule 3.1 is aimed at preventing repeat offenders escaping notice and building confidence in the legal system as a whole. Hazard and Hodes, § 3.1:301.

tigation of the case. Because of his autism, Quinton was unable to provide any information about his care at the Center. However, Mrs. Stephens provided the details of what happened on December 2, 1994. In addition, she related at least three other incidents which suggested that the Center may not have been rendering adequate supervision of Quinton.[13] Mrs. Stephens also told Mr. Neely about conversations she had with some of the employees at the Center which caused her to believe that Quinton's posture correcting chair had been used for discipline or management purposes against her specific directions.[14] The record indicates that Mr. Hunter and Mr. Neely received no cooperation from the defendants during their investigation. In the end, they were left with the choice of advising the Stephenses to give up or file the complaint and proceed with discovery. Given these circumstances, we find that Mr. Hunter and Mr. Neely did not violate Rule 3.1

Accordingly, based on all of the above, the complaint filed against Mr. Hunter and Mr. Neely is dismissed.

Charges dismissed.

Justice McCUSKEY dissents.

WORKMAN, Justice, concurring:

(Filed July 17, 1998)

I initially put down for a concurring opinion to say only that although the Lawyer Disciplinary Board dropped the charge involving the letter written to the complainant herein, it should be made clear that the tone and tenor of that letter was threatening and it was wrong. Indeed, it is the kind of thing that can give lawyers a very bad reputation.

The record shows that Mrs. Hawks runs a reputable business that provides a real service to children whose parents must leave them in day care in order to go to work. The letter sent to her by the lawyer here was intimidating and basically threatened to ruin her business and her reputation if she did not meet its demands. This is not a legitimate effort at settlement, but more in the manner of intimidation. As the majority opinion points out, had the charge involving the letter not been dropped by the Lawyer Disciplinary Board, Neely may well have been sanctioned.

After reading the local Charleston newspapers on July 16 and 17, however, I feel it necessary to expand this concurring opinion to say more. If quoted correctly in the newspapers, Mr. Neely and Mr. Hunter had the audacity to once again claim the lawsuit they brought against Mrs. Hawks and the Fort Hill Day Care Center had merit.[1] This is fairly incredible in view of the fact that the lower court dismissed part of the lawsuit as being without merit and in view of the fact that lawyers Neely and Hunter sought a voluntary dismissal of their remaining claims (and agreed not to appeal the lower court's dismissal)[2] in exchange for the defendants

---

13. Ms. Stephens recalled an earlier incident in which she had found evidence of a latex balloon in Quinton's bowel movement; an instance where Quinton was allowed to eat dirt so that his bowel movement contained small pebbles; and an occasion where Quinton became completely stuck in the mud at the Center.

14. A former employee of the Center told Mrs. Stephens that the staffing situation at the Center was poor and that two teachers did not like Quinton or having to deal with him. Two other staff members had informally warned Mrs. Stephens of incidents of staff neglect or improper restraint of Quinton.

1. The *Charleston Daily Mail* on July 16, 1998, and the *Charleston Gazette* on July 17, 1998, quoted Richard Neely as saying that the charges against him were "silly," and characterized the ethics complaint as an allegation "that I too vigorously went to bat for a black autistic child allegedly *abused* in a day care center." (emphasis added) Roger Hunter is quoted as saying that the lawsuit (against the center) was "meritorious."

2. According to the majority opinion:

On December 11, 1995, the defendants moved for summary judgment. The court dismissed Mr. and Mrs. Stephens causes of action for intentional infliction of emotional distress. The court also dismissed Quinton's claim for intentional infliction of emotional distress for the "many instances" in which he was allegedly strapped in a chair in a dark room for many

agreeing to dismiss a Rule 11 [3] motion seeking monetary sanctions against them.

It is amazing that after getting off by the skin of their teeth for filing a spurious lawsuit and writing a threatening letter, Neely and Hunter would actually again attempt to cast aspersions against this individual and this day care center. These lawyers may never learn their lesson until the time comes when a real sanction is imposed, either through ethical proceedings or in the form of a lawsuit. If they were misquoted, they should immediately demand that a correction be printed. But if they were not misquoted, then shame on them for conducting themselves in this manner. It does not bring respect to the profession.

I am authorized to state that Justice MAYNARD joins in the concurring opinion.

hours. This claim was dismissed because the only evidence plaintiffs produced during discovery was the testimony of Mary Ellen Davis, Quinton's special education teacher, that one day she found Quinton in the chair in his classroom when all the other children were up and about in the same room. Finally, the claim for punitive damages was dismissed for being duplicative of the claim for damages from intentional infliction of emotional distress. Only Quinton's claim for intentional infliction of emotional distress was permitted to go forward.

Subsequently, the plaintiffs requested a voluntary dismissal of the remaining claim in order to appeal the summary judgment order. Defendants then filed a motion for sanctions under Rule 11 of the West Virginia Rules of Civil Procedure. Thereafter, the parties reached an agreement whereby plaintiffs agreed to dismiss the appeal and all claims with prejudice in return for the defendants dismissing the Rule 11 motion and agreeing not to seek attorney sanctions against either Mr. Hunter or Mr. Neely.

3. At that time, Rule 11 provided, in pertinent part:

The signature of an attorney or party constitutes a certificate by him that he has read the pleading, motion, or other paper; that to the best of his knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law, and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation.... If a pleading, motion, or other paper is signed in violation of this rule, the court, upon motion or upon its own initiative may impose upon the person who signed it, a represented party, or both, an appropriate sanction, which may include an order to pay to the other party or parties the amount of the reasonable expenses incurred because of the filing of the pleading, motion, or other paper, including a reasonable attorney's fee.

Rule 11 was amended on February 19, 1998, to correspond with Rule 11 of the Federal Rules of Civil Procedure and became effective April 6, 1998.